Mark A. HOPKINSON, Petitioner,

v.

Duane SHILLINGER and the Attorney General of the State of Wyoming, Respondent.

Civ. A. No. C85–0483.

United States District Court, D. Wyoming.

Aug. 4, 1986.

384

Leonard D. Munker, Cheyenne, Wyo., for petitioner.

A.G. McClintock, Wyoming Atty. Gen., Allen C. Johnson, Sr. Asst. Atty. Gen.,

Richard Stacy, U.S. Atty., Cheyenne, Wyo., for respondent.

## MEMORANDUM AND ORDER

SAFFELS, District Judge, Sitting by Designation.

Petitioner has before this court a petition for writ of habeas corpus. Petitioner was found guilty of four counts of first degree murder and two counts of conspiracy and judgment was entered on September 27, 1979. He was sentenced on the murder counts, upon recommendation of the jury, to life imprisonment for the three murders of the Vehar family and sentenced to death for the murder of Jeff Green. The Wyoming Supreme Court in *Hopkinson v. State (Hopkinson I)*, 632 P.2d 79 (Wyo. 1981), *cert. denied*, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982), affirmed the convictions but set aside the death sentence, remanding to the trial court for a new sentencing trial. After a second penalty hearing, the sentence of death was reimposed on May 27, 1982. The Wyoming Supreme Court affirmed in *Hopkinson v. State (Hopkinson II)*, 664 P.2d 43 (Wyo. 1983), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). Subsequently, petitioner filed a motion for new trial, which denial was upheld in *Hopkinson v. State (Hopkinson III)*, 679 P.2d 1008 (Wyo. 1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 228, 83 L.Ed.2d 157 (1984). In *State, ex rel. Hopkinson v. District Court (Hopkinson IV)*, 696 P.2d 54 (Wyo.1985), *cert. denied*, — U.S. —, 106 S.Ct. 187, 88 L.Ed.2d 155 (1985), the Wyoming Supreme Court affirmed the trial court's dismissal of plaintiff's consolidated petition for post-conviction relief and writ of habeas corpus. Thereafter in *Hopkinson v. State (Hopkinson V)*, 704 P.2d 1323 (Wyo.1985), the Wyoming Supreme Court affirmed the district court's denial of sentence reduction along with its denial of other challenges pertaining to petitioner's sentence. A petition for writ of habeas corpus was thereafter filed and denied in *Hopkinson v. State (Hopkinson VI)*, 708 P.2d 46 (Wyo.1985). Finally, in *Hopkinson v. State (Hopkinson VII)*, 709 P.2d 406 (Wyo.1985), the Wyoming Supreme Court affirmed the district court's denial of petitioner's request for grand jury proceedings.

The general factual background surrounding this case has been set forth in *Hopkinson I* and *Hopkinson II* and need not be restated here. The court will specifically consider the record and relevant factual concerns herein as they may relate to the particular issue at hand.

As a preliminary matter, petitioner has certain motions outstanding. Petitioner's motion for discovery will be discussed *infra*. His motion to expand the record has to a certain extent been ruled on, as the court has allowed numerous exhibits and affidavits to become part of the record. The motion for evidentiary hearing shall be denied as the court has determined the record provides a sufficient basis for decision. As to petitioner's motion pursuant to 28 U.S.C. § 2254, Rule 6, the court finds that no good cause exists for the granting of this motion.

The court would note that the state courts have dealt exhaustively with the issues raised by petitioner herein. The court is well aware of the standards surrounding 28 U.S.C. § 2254(d) concerning the presumption of correctness regarding state court determinations, particularly in light of the recent United States Supreme Court case of *Miller v. Fenton*, — U.S. —, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). Throughout the discussion of the legal issues involved herein, the court independently reviewed the record and reached its own conclusions on the majority of the issues, although pursuant to § 2254(d), the state court findings can be afforded a presumption of correctness.

## A. EX POST FACTO

Petitioner in issue No. I of his petition argues that the Wyoming court lacked jurisdiction to try him on charges of aiding and abetting when the accessorial acts did not occur in Wyoming. Petitioner asserts that the decision of the Wyoming Supreme

Court in *Hopkinson I,* 632 P.2d 79, relating to this issue, effectively changed the law of the state and should not have been given retroactive application. Petitioner therefore asserts that the ex post facto clause of the United States Constitution, Article I, § 10 was violated in this instance.

This argument concerns petitioner's prosecution for the murder of Jeff Green which occurred in Wyoming while petitioner was incarcerated in California. Petitioner was charged as an accessory before the fact for this murder. Of particular concern to petitioner is the Wyoming Supreme Court's ruling in *Hopkinson I,* 632 P.2d 79, which found the language of an earlier case, *Goldsmith v. Cheney,* 468 P.2d 813 (Wyo. 1970) to be overly broad. In that case, Goldsmith was arrested in Wyoming upon a fugitive warrant issued from Nevada for a murder which occurred there. The murder charge was eventually dropped and upon Goldsmith's return to Wyoming, he was charged as an accessory before the fact to murder. The relevant statute, Wyoming Statute § 6–14 (1957) provided:

> Accessory before the fact.—Every person who shall aid or abet in the commission of any felony, or who shall counsel, encourage, hire, command, or otherwise procure such felony to be committed, shall be deemed an accessory before the fact, and may be indicted, informed against, tried and convicted in the same manner as if he were a principal, and either before or after the principal offender is convicted or indicted or informed against; and upon such conviction he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principal.

Goldsmith argued that the language "any felony" referred only to felonies committed in Wyoming. The Wyoming Supreme Court concluded that:

> By decisions of this Nation's courts in cases dealing with felonies in which the preparations occurred in one state and the actual felony in another, it has been held, consistent with the common law rule, that absent a statute which pro-

vides otherwise an accessory before the fact may be tried where the accessorial act took place and only there....

*Goldsmith,* 468 P.2d at 816.

In *Hopkinson I,* 639 P.2d 79, the Wyoming Supreme Court evaluating the language of Wyoming Statute § 6–1–114 (1977), which remained unchanged from Wyoming Statute § 6–14 (1957), found that the statutory language "tried and convicted in the same manner as if he were a principal" grants Wyoming jurisdiction if the felony occurred in Wyoming regardless of where the accessorial acts took place. Finding the language of *Goldsmith v. Cheney* to be unduly broad, the Wyoming Supreme Court read the rule of *Goldsmith* to mean that Wyoming has jurisdiction over an accessory before the fact if any accessorial acts occur in Wyoming. The court held that Wyoming has jurisdiction to try an accessory before the fact if the underlying crime occurred within the boundaries of the state.

In the instant case, petitioner argues that in *Hopkinson I,* the Wyoming Supreme Court changed the interpretation of the statute defining an accessory before the fact and applied this change in an ex post facto fashion. Petitioner does not claim error in the Wyoming Supreme Court's jurisdictional conclusion, but argues only that said ruling was improperly given retroactive effect.

 The United States Supreme Court first discussed the ex post facto prohibition in *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798). In that case, the court declared ex post facto laws to include:

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law

required at the time of the commission of the offence, in order to convict the offender.

*Id.,* 3 U.S. at 390. The ex post facto clause "was intended to secure substantial personal rights against arbitrary and oppressive legislation ... and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance." *Beazell v. Ohio,* 269 U.S. 167, 171, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925) (citations omitted). A procedural change that may work to a defendant's disadvantage is not ex post facto. *Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977), *reh'g denied,* 434 U.S. 882, 98 S.Ct. 246, 54 L.Ed.2d 166 (1977). Whether an alteration of procedure will be found to be ex post facto is a matter of degree. *Beazell,* 269 U.S. 167, 46 S.Ct. 68.

 The ex post facto clause is "directed against legislative action only, and does not reach erroneous or inconsistent decisions by the courts." *Frank v. Mangum,* 237 U.S. 309, 344, 35 S.Ct. 582, 594, 59 L.Ed. 969 (1915). However, the principle upon which the ex post facto clause is based, that persons have a right to fair warning of that conduct which gives rise to criminal penalties, is fundamental and is protected against judicial action by the due process clause of the fifth amendment. *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). A court may not unforeseeably enlarge the application of a criminal statute. *Id. See also Bowie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). In *Bowie,* the court found that an unforeseeable and retroactive judicial expansion of narrow and precise statutory language deprived a defendant of his right of fair warning regarding what conduct would be deemed criminal. The fact that the statutory language in issue was "narrow and precise" was an important factor in the court's decision. *See Marks,* 430 U.S. 188, 97 S.Ct. 990.

 In the instant case, the statutory language in question does not define any

particular conduct as criminal but only provides that an accessory before the fact shall be treated in the same manner as a principal. The language is not by itself narrow and precise or limiting. The dicta in the *Goldsmith* opinion is what petitioner relies on as the limiting factor. This court cannot conclude that the reasoning of the Wyoming Supreme Court in *Hopkinson I,* 632 P.2d 79 was unforeseeable given the language of the statute in question.

 Additionally, the statute and case law in question are more of a procedural rather than a substantive nature. *See Post v. United States,* 161 U.S. 583, 16 S.Ct. 611, 40 L.Ed. 816 (1896) (statute requiring criminal proceedings to take place in a district which it created is not a matter of substantive law, but is a matter of jurisdiction and procedure). The prescribing of a different mode of procedure and the abolition of courts and the creation of new ones which leave untouched all the substantive protections which are then existing does not fall within the proscriptions of the ex post facto clause. *Duncan v. Missouri,* 152 U.S. 377, 14 S.Ct. 570, 38 L.Ed. 485 (1894). The ruling of the court in *Hopkinson I,* 632 P.2d 79 did not make as criminal an act which was innocent when done; did not aggravate an offense or change the punishment and make it greater than when it was committed; did not alter the rules of evidence and did not deprive petitioner of any substantial right or immunity which he possessed at the time of the commission of the offense charged. *See Mallett v. North Carolina,* 181 U.S. 589, 21 S.Ct. 730, 45 L.Ed. 1015 (1901). An act which "only includes the place of the commission of the offense within a particular jurisdictional district, and subjects the accused to trial in that district rather than in the court of some other jurisdictional district established by the government against whose laws the offense was committed" does not alter a defendant's situation in respect to his offense or its consequences. *Cook v. United States,* 138 U.S. 157, 183, 11 S.Ct. 268, 275, 34 L.Ed. 906 (1891). Evaluating the record and the relevant law, the court

herein finds that the decision of the Wyoming Supreme Court in *Hopkinson I*, 632 P.2d 79 restricting the *Goldsmith* holding did not violate the ex post facto clause of the United States Constitution and the portion of petitioner's petition relating to this argument shall be dismissed.

### B. DEATH-QUALIFIED JURORS

■ The court will now consider petitioner's arguments numbered II and III as there is some overlap of these issues. In argument II, petitioner asserts that the prosecution's exclusion of jurors with reservations about the death penalty denied him his right to a jury constituting a representative cross-section of the community and resulted in the selection of a jury which was prosecution-prone. Petitioner asserts, in argument III, that the death-qualifying process used by the prosecution was prejudicial in that it predisposed the jury into believing petitioner was guilty and thus likely to be sentenced to death.

The United States Supreme Court effectively resolved these issues in *Lockhart v. McCree*, —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). *Lockhart* considered the question of whether the Constitution prohibited the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial. The Court found that exclusion of a group defined solely in terms of shared attitudes does not contravene the objectives of the fair cross-section requirement and such groups are not viewed as "distinctive groups" for fair cross-section purposes. *Id.*, at ——, 106 S.Ct. at 1764-65. Recognizing that an impartial jury consists of nothing more than jurors who will conscientiously apply the law and find the facts, the Court rejected the argument that the death-qualifying process violates a defendant's constitutional right to an impartial jury. The Court noted that the Constitution does not require a certain mix of individual viewpoints on a jury. Elaborating further, the Court stated:

> In our view, it is simply not possible to define jury impartiality, for constitutional purposes, by reference to some hypothetical mix of individual viewpoints. Prospective jurors come from many different backgrounds, and have many different attitudes and predispositions. But the Constitution presupposes that a jury selected from a fair cross-section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case.

*Id.* at ——, 106 S.Ct. at 1770.

*Lockhart* did not specifically address the issue petitioner raises herein pertaining to the death-qualifying process as being prejudicial by predisposing the jury into believing guilt, but the court finds this issue to be within the ambit of the Court's discussion of an impartial jury. This court has carefully reviewed the record, in particular, the comments of the Special Prosecutor to which petitioner refers in his petition and finds that when read in their proper context, these comments and questions cannot be found to prejudice the jury.

■ The first specific portions to which petitioner objects is the reference by the Special Prosecutor as the death penalty being "an ultimate punishment ... [f]or an ultimate crime." The questioned dialogue reads as follows:

> MR. SPENCE: What do you think about the death penalty, Ms. Calhoun?
>
> MS. CALHOUN: Well, I feel in our society that we live in we must have punishment of some sort.
>
> MR. SPENCE: An ultimate punishment?
>
> MS. CALHOUN: Right.
>
> MR. SPENCE: For an ultimate crime?
>
> MS. CALHOUN: Right.

(Tr. Vol. I, p. 225).

. . . .

**390**

MR. SPENCE: In this case the defendant is charged with 4 counts of murder, as I think you know by now.

MR. KIRKPATRICK: Yes.

MR. SPENCE: Which is the ultimate crime and in this case the State is asking for the ultimate penalty. How do you feel about that?

MR. KIRKPATRICK: I feel it's a law that is not pleasant to impose on someone but if it has to be done I could do it.

MR. SPENCE: Would you do it if you felt it justified?

MR. KIRKPATRICK: Yes, sir.

(Tr. Vol. II, p. 433).

When read in proper context, these statements cannot be viewed as prejudicial.

■ Petitioner also specifically objects to the prosecution's questioning of certain jurors which petitioner views as assuming his guilt. For example:

MR. SPENCE: Mr. Emrick, on the death penalty you have heard us talking about that. Do you have any conscious objection to the death penalty?

MR. EMRICK: No, I don't.

MR. SPENCE: And in this case in the event the aggravated circumstances, the bad, outweigh the good would you have any hesitancy to do your duty and return a verdict that would involve the death penalty?

MR. EMRICK: I would support the law.

MR. SPENCE: If the law required you to do that, to return the death penalty, would you do it?

MR. EMRICK: Yes.

(Tr. Vol. I, p. 234).

. . . .

MR. SPENCE: Yes. Now, how do you feel about the death penalty?

MR. WALL: I feel that it's wrong for one person or a group of persons to take another's life, but I think—you asked me how I feel?

MR. SPENCE: Yes. And I'm listening.

MR. WALL: I'm trying.

MR. SPENCE: You're trying to get those two hooked up together?

MR. WALL: Not necessarily together.

MR. SPENCE: Now, let's do this and I see you're able to do this. Let's kind of project yourself, if you would, a month down the line. You're in the jury room. You're now required to vote. You're in the second part of the trial. The issue is whether this man should die or not.

MR. WALL: Yes.

MR. SPENCE: You have heard the testimony; you have weighed the circumstances and you have concluded that the aggravating circumstances outweigh the mitigating. The bad outweighs the good.

Can you picture yourself there?

MR. WALL: Yes, sir, I think I can.

MR. SPENCE: How would you vote?

MR. WALL: You're speaking of the penalty phase?

MR. SPENCE: Yes.

MR. WALL: I would vote for the death penalty if that was the case.

(Tr. Vol. II, p. 393–4).

The court cannot deem these questions to be prejudicial and finds them to be within the proper scope of voir dire in this case. The Special Prosecutor did not overstep his bounds in these and the other instances cited by petitioner in his petition. The very nature of questions pertaining to the death penalty assumes that the jury has already rendered a guilty verdict in a hypothetical situation. There was nothing so inherently prejudicial as to pose an unacceptable threat to petitioner's right to a fair trial. *See Holbrook v. Flynn,* —— U.S. ——, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). The questions and comments referred to were proper. It follows that issues No. II and III of the petition shall be dismissed.

## C. SEVERANCE & OTHER BAD ACTS AFFECTING THE RIGHT TO A FAIR TRIAL

Petitioner argues in issue V of his petition that his right to a fundamentally fair trial was violated by the joinder of several

unrelated charges in one trial and by the introduction of irrelevant bad acts and crimes allegedly committed by him. Specifically, petitioner asserts that joining the charges of conspiring with Jim Taylor to kill Vincent Vehar, conspiring with Mike Hickey to kill William Roitz, aiding and abetting Mike Hickey in the murders of Vincent, Beverly and John Vehar and aiding and abetting unknown killers in the death of Jeff Green was "prejudicial on its face, in that it caused Petitioner to be placed on trial for being a bad man." Petitioner asserts that this joinder had a snowballing effect and was fundamentally unfair.

After careful review, the court cannot conclude that the joinder of these charges in one action was fundamentally unfair and violated petitioner's due process rights. Rule 11, Wyoming Rules of Criminal Procedure provides for joinder of offenses when they "are of the same or similar character or are based on the same act or transaction, or on two (2) or more acts or transactions connected together or constituting part of a common scheme or plan." Rule 13, Wyoming Rules of Criminal Procedure provides in pertinent part:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses ... in an indictment or information, or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires.

These rules emanate from the Federal Rules of Criminal Procedure and precedent from the federal courts is given great weight. *See Dobbins v. State*, 483 P.2d 255 (Wyo.1971). One prime consideration in determining prejudicial effect of joinder is whether evidence relating to the similar offenses charged would be admissible in the separate trial of each offense. *Id.* at 259.

The decision to sever is discretionary with the trial court and a decision to deny severance will not be disturbed absent an abuse of discretion. *United States v. Dickey*, 736 F.2d 571 (10th Cir. 1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). To find an abuse of discretion, the reviewing court must find that the joinder caused either actual or threatened deprivation of one's right to a fair trial. *Id.* A defendant bears a heavy burden of showing real prejudice to his case and must show more than that he would have had a better chance of acquittal with separate trials. *United States v. Howard*, 751 F.2d 336 (10th Cir. 1984), *cert. denied*, — U.S. —, 105 S.Ct. 3507, 87 L.Ed.2d 638 (1985).

Petitioner has failed to meet his heavy burden to establish that the trial court abused its discretion by denying severance, thus resulting in a deprivation of his right to a fair trial. The essence of his argument seems to be that his chances for acquittal would have been greater had he been tried separately for the several counts. The trial court did not abuse its discretion by joinder of all charges in one action. The charges were so intertwined that evidence admissible for the conspiracy counts would also have been admissible for the Vehar murders. Further, the evidence pertaining to the conspiracies and Vehar murders would likewise be admissible in a trial concerning the murder of Jeff Green. Even if separate trials were conducted, the facts surrounding these separate counts were such that they must be raised for purposes of motive or intent. Defendant was not deprived of his constitutional right to a fair trial because of the joinder of all charges against him in one action.

Petitioner's other arguments relating to his denial of a fundamentally fair trial concerns the admission into evidence of other misconduct. The instances to which petitioner refers are the beating of J.R. Goo, a member of the sewer board, (Tr. Vol. IV, p. 205–206, 214; Tr. Vol. XIV, p. 1786, 1932); an attempt to bribe a board member, (Tr. Vol. IV, p. 258); a fight between Mark and Joe Hopkinson and Frank Roitz, (Tr. Vol. V, p. 392–399; Tr. Vol. VI, p. 656–7); possession of marijuana (Tr. Vol. IX, p. 927, 920); placing bets with Hap Russell (Tr.

Vol. XI, p. 1341, 1344), and the Mariscal trial in which it was alleged that petitioner sent Jeff Green with a dynamite bomb to blow up the car of an attorney in Arizona in order to collect a debt (Tr. Vol. VIII, p. 1355–1372). Other instances to which petitioner objects include testimony by Roger Coursey that petitioner had the ability to have someone hurt (Tr. Vol. V, p. 590); testimony by Mike Hickey that he was afraid of petitioner, that he was wearing a bullet-proof vest and that petitioner was hauling drugs (Tr. Vol. VIII, p. 1228–9), along with references that petitioner was said to have wanted Jamey Hysell dead for once giving a statement against him (Tr. Vol. IX, p. 943), and that petitioner was said to "hang out" with a "con man" named Richard Taylor (Tr. Vol. XII, p. 1611).

The instances concerning the beating of J.R. Goo were introduced during evidence for the purpose of explanation of why a sewer board meeting had to be canceled. The testimony of the witness did not connect petitioner with the beating although the prosecution in closing did infer such a connection. Counsel at trial did not object to such inferences and the jury was instructed that comments of counsel were not to be considered as evidence.

The court must review under plain-error standards where counsel has failed to object in the proceedings below. *See United States v. Devous,* 764 F.2d 1349 (10th Cir.1985). Plain error has been defined as error so obvious or otherwise seriously affecting the fairness, integrity or public reputation of the judicial proceeding and as "error so 'plain' the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *Id.* at 1353 (quoting *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). The court cannot find these comments to amount to plain error.

The evidence concerning the attempt to bribe a board member was not objected to at trial and does not arise to the level of plain error. Further, this evidence was relevant in terms of laying the background and intensity surrounding the dispute between petitioner and the sewer board, thus contributing to petitioner's animosity toward Vincent Vehar.

References to the fight between the Hopkinsons and Frank Roitz were not improperly admitted as it pertained to petitioner's motive to kill Vincent Vehar, who was the attorney representing Mr. Roitz and advising him to press charges against petitioner. This was admitted in conformance with Rule 404(b), Wyoming Rules of Evidence, providing that evidence of other crimes, wrongs or acts is not admissible to prove character but may be offered for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. The jury was further advised by the court that such evidence was presented for this limited purpose.

The evidence pertaining to petitioner's trial for the possession of marijuana was not objected to and was used for the purpose of establishing a time frame for conversations occurring between Jeff Green and his attorney, Donley Linford. Likewise, the testimony from Hap Russell that petitioner made a few bets with him was not objected to and was offered as a means of establishing the relationship which existed between petitioner and Mr. Russell. The court cannot conclude that petitioner was so prejudiced by these references as to make them rise to the level of plain error.

The references made to the Mariscal trial were objected to but were properly admitted by the trial court. The evidence introduced regarding the Mariscal matter included a description of the dynamite bomb involved therein as well as the part played by Jeff Green concerning the matter. This evidence had relevance in that it went toward proving motive regarding Jeff Green's death and toward proving identity concerning the dynamite bomb used in the bombing of the Vehar home. Guidelines in

determining whether evidence of other crimes or acts should be admitted have been stated as follows:

> The evidence (1) must tend to establish intent, knowledge, motive, identity, or absence of mistake or accident; (2) must also be so related to the charged offense that it serves to establish intent, knowledge, motive, identity, or absence of mistake or accident; and (3) must have real probative value, not just possible worth.

*United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986). The evidence concerning the Mariscal matter had distinct probative value pertaining to the crimes for which petitioner was charged in the instant case and its probative value far outweighed the risk of unfair prejudice.

The testimony by Roger Coursey concerning petitioner's ability to have someone hurt was generally objected to at trial in that counsel took the position that all material concerning "loose idle talk which is purely a collateral matter" be stricken (Tr. Vol. V, p. 577). The trial court overruled the objection in that Mr Coursey was allowed to testify concerning petitioner's statments that "if he needed someone ripped off forceably or otherwise", (Tr. Vol. V, p. 579) petitioner would be able to have it done for him. This evidence was probative in that Jeff Green was identified as someone who could transport drugs for petitioner, thus exemplifying petitioner's control over Green near the period of time concerning the Mariscal incident. Further, the statement had relevance in that it was an admission by petitioner concerning his capabilities for causing harm. As such, it was properly admitted.

The testimony by Mike Hickey concerning his fear of petitioner, his wearing of a bullet-proof vest, and his comment that the petitioner was hauling drugs was not objected to at trial. This testimony was relevant concerning the relation between Mr. Hickey and petitioner and its admission does not amount to plain error.

The testimony by Jeff Green, which was read into the court record in this case, concerning petitioner's statement that he wanted Jamey Hysell dead for giving a statement against him, was not specifically objected to at trial but defense counsel did object to the reading of the transcript as inadmissible hearsay. The jury was instructed that the testimony was not offered to prove the truth of the facts stated therein. The admission of this statement did not affect petitioner's right to a fair trial and was relevant considering the circumstances of the Vehar bombing and the murder of Jeff Green after he had testified against petitioner.

The statement that petitioner was said to hang out with a con man named Richard Taylor was not directly relevant to the issues involved at trial; however, the court cannot conclude that petitioner was prejudiced by the statement. The testimony pertained to a person associated with petitioner in 1971 and played a minor part in the overall trial. Viewing the trial as a whole, the testimony was of minimal significance.

The instances and statements to which petitioner refers were properly admitted or were of such a nature so as not to have deprived him of a fundamentally fair trial. Petitioner's due process rights were not violated on these grounds, accordingly, issue V of his petition must be dismissed.

### D. DENIAL OF IMPEACHMENT THROUGH POLYGRAPH EXAMINATION RESULTS

In issue No. IX of the petition, petitioner argues that his due process rights were violated when the trial court refused to allow him to impeach the testimony of Mike Hickey through evidence of a polygraph examination which Hickey had previously taken. Mr. Hickey was the person who, at the direction of petitioner, placed the bomb in the Vehar home. Mr. Hickey was also responsible for the murder of fifteen-year

old Kelly Wyckhuyse. The prosecution theorized that petitioner knew of the Wyckhuyse murder and used this knowledge to manipulate Hickey and further sought to protect Hickey from prosecution by providing him with an alibi and by inducing the County Attorney to drop the Wyckhuyse murder charges against Hickey.

Petitioner sought to introduce evidence concerning Mr. Hickey's passage of a polygraph examination as an explanation of why the murder charges against him were dismissed. Petitioner sought to introduce this evidence if Hickey testified concerning why the charges against him were dismissed (Tr. Vol. VII, p. 1049). The court has carefully reviewed the record and finds that at no time did Hickey speculate as to why charges against him were dismissed. Related testimony concerned the later accusation against Jamey Hysell as being Kelly Wyckhuyse's murderer and the part petitioner played in the manufacturing of this story.

 The trial court properly refused to admit the results of Hickey's polygraph examination. The Wyoming rule regarding polygraph examinations was discussed in *Cullin v. State*, 565 P.2d 445 (Wyo.1977). Therein it was stated that results of a polygraph examination could be admitted into evidence where the parties had previously stipulated to the admission and there is some test of reasonable reliability. *Id.* at 457.

In the instant case, no stipulation was made concerning the admissibility of Mike Hickey's polygraph examination. Further, there is nothing in the record which would indicate its reliability. The prosecution did not inquire of Mr. Hickey why the charges against him were dismissed nor did defense counsel question him concerning whether he ever took such an examination. The trial court offered the defense the option of inquiring of Mr. Hickey whether he had ever taken a polygraph examination should the defense feel such questioning might become necessary, thus letting the jury draw its own conclusion. This court fails to see how petitioner was prejudiced in any

way by the trial court's proper exclusion of this evidence. No error was committed and petitioner's due process rights were not violated. Issue No. IX of the petition shall be dismissed.

## E. PROSECUTOR'S COMMENTS ON CREDIBILITY AND FACTS NOT IN EVIDENCE

In issue No. X of his petition, petitioner argues that comments made by the prosecutor throughout trial and particularly in voir dire, the opening statement, and the closing argument, were comments on credibility and facts not in evidence, thus rendering petitioner's trial fundamentally unfair.

 A prosecutor is permitted to prosecute with earnestness and vigor, however, he is not at liberty to strike foul blows. *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). A prosecutor breaches his duty to refrain from overzealous conduct when commenting on the defendant's guilt and offering unsolicited personal views on the evidence. *Id.* The primary question is whether the comments made by the prosecutor were so prejudicial as to deprive a defendant of his sixth amendment right to a fair trial. *United States v. Dickey*, 736 F.2d 571. If a constitutional violation is established, the government can only prevail if it proves beyond a reasonable doubt that the defendant would have been convicted absent the prosecutor's unconstitutional remarks. *United States ex rel. Burke v. Greer*, 756 F.2d 1295 (7th Cir.1985). The government must demonstrate by more than circumstantial evidence that the defendant is guilty. *Id.* The case against the defendant must be "overwhelming" in order to apply the harmless error rule. *Id.* at 1302.

 Petitioner asserts that the prosecutor vouched for the credibility of the state's witnesses and expressed his own opinion throughout the course of his closing argument. Petitioner further asserts that the prosecutor expressly stated that he had access to information outside the record.

In particular, petitioner objects to the prosecutor's references to members of his support staff who did not testify at trial. The court has carefully reviewed the record and cannot agree that the references to which petitioner complains created the inference that the prosecution had access to other information verifying defendant's guilt. Nor can the court conclude that the prosecutor was expressing his personal opinion and vouching for the credibility of the state's witnesses. The court cannot view the prosecutor's statements in a vacuum. *See United States v. Young,* 105 S.Ct. 1038. Upon review of the entire record, the court cannot conclude that the remarks of the prosecution denied petitioner of his right to a fair trial as guaranteed by the sixth amendment.

The purpose of closing argument is to allow the parties an opportunity to offer to the jury ways of viewing the significance of the evidence. *Browder v. State,* 639 P.2d 889 (Wyo.1982). Remarks of a prosecutor which are fairly anchored to the facts and do not divert the jury from its sworn duty to decide the issue of innocence or guilt based on the evidence and the instructions of the court have been held to be proper. *United States v. Shelton,* 736 F.2d 1397 (10th Cir.1984), *cert. denied,* 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 119 (1984). The court finds the remarks of the prosecutor to fall within authorized bounds. In a case where both sides argue vigorously and aggressively, the prosecutor's closing argument "need not be confined to such detached exposition as would be appropriate in a lecture." *United States v. Dickey,* 736 F.2d at 596 (citing *United States v. Bishop,* 534 F.2d 214, 220 (10th Cir.1976) quoting *United States v. Isaacs,* 493 F.2d 1124, 1164 (7th Cir.1974), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974)).

Regarding petitioners references to the prosecutor's statements concerning defendant's allegations that the prosecution prostituted itself, the court would note that these comments were in response to an attack upon the prosecution made by

defendant. A prosecutor is given considerable latitude in responding to an argument raised by his opponent. *United States v. Dickey,* 736 F.2d at 596. The remarks by the prosecutor under all the circumstances did not constitute error. Although "invited responses" are not favored, in this instance the prosecution was attacked by defense counsel and the responding comments were an attempt to "right the scales." *See United States v. Young,* 105 S.Ct. 1038.

The statement by the prosecutor pertaining to the fact that he did not interrupt defense counsel because he wanted him to have a fair opportunity to present his whole story and he hoped that counsel would extend to him the same courtesy did put petitioner's counsel in a tenuous position in front of the jury. However, counsel did not object to this statement when made and the court cannot conclude that the statement was so prejudicial as to constitute plain-error.

Petitioner also objects to the prosecution's references to the defendant's opening statement and the inferences that he failed to produce any evidence to support his claims. The jury was properly instructed that the petitioner was under no duty to produce any evidence. Further, the statements of the prosecution pertaining to this matter were not prejudicial. During the course of the long trial, the prosecutor's comments were an attempt to summarize the evidence as opposed to the claims of opposing counsel. The court cannot conclude that these remarks were a direct or indirect comment on petitioner's failure to testify.

In summary, the prosecution's closing argument was sufficiently tied to the facts, did not invade the province of the jury, and did not violate petitioner's right to a fair trial. Although an instruction is not always curative, the jury was properly instructed in this case that arguments by the parties are not to be viewed as evidence in the case. *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431

(1974). It follows that issue No. X of the petition shall be dismissed.

## F. SUFFICIENCY OF THE EVIDENCE

Petitioner asserts in argument No. XI of his petition that there was insufficient evidence to support his convictions. Petitioner asserts that the jury had to resort to speculation in order to convict on all six counts, but particularly in reference to the Green homicide.

The correct constitutional standard to be applied in a case such as this is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Pilon v. Bordenkircher*, 444 U.S. 1, 2, 100 S.Ct. 7, 8, 62 L.Ed.2d 1 (1979) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

██ The evidence presented at trial surrounding the murder of Jeff Green was set forth in *Hopkinson I*, 632 P.2d 79, 148–149 as follows:

As to Hopkinson's involvement in the Jeff Green murder, the evidence which was adduced at trial included the facts that (1) Jeff Green knew of and was willing to testify about various crimes—including the Wyckhuyse murder, the Mariscal matter, and the conspiracy to murder Vehar—all of which circumstantially evinced Hopkinson's motive to silence Green; (2) Hopkinson had not only threatened Green personally, but also told Jennifer Larchick in March of 1979 that he was "going to get Jeff" (Tr. Vol. XI, p. 1219); (3) once imprisoned, Hopkinson discovered through phone calls to Jennifer that Green was talking to prosecutors investigating the Vehar bombing (Tr. Vol. XI, pp. 1224–1226); (4) Hap Russell visited Hopkinson in prison and, according to Russell's testimony, agreed to arrange to buy, for twenty thousand dollars, perjured testimony to be used to get Mark out of jail (Tr. Vol. XII, p. 1419); (5) Hopkinson called Larchick requesting her to send a photo of Green to Russell, which she eventually did (Tr. Vol. XI, pp. 1228–1237); (6) Russell, meanwhile, contacted several individuals in Salt Lake City in reference to the job Hopkinson wanted done, gave them Green's photo and became involved in large money transactions with them (Tr. Vol. XII, pp. 1485, 1500); (7) in the middle of May of 1979, Green went to his grandmother's funeral in Iowa (Tr. Vol. X, p. 1052); (8) at this time, Hopkinson again commenced calling Larchick daily in order to check on Green's whereabouts and see if Jennifer would watch for cars with Utah license plates (Tr. Vol. XI, p. 1240); (9) Larchick informed Hopkinson that the grand jury investigating the Vehar bombing would be starting and that she was subpoenaed to testify on May 24th (Tr. Vol. XI, p. 1242); (10) Green turned up missing May 18th (Tr. Vol. X, pp. 1061–1062); (11) on the same day that Larchick informed him Green was missing, Hopkinson called Kristi King and requested that she allow him to deposit some money in her bank account (Tr. Vol. XII, p. 1629); (12) after she agreed, on May 21st King received word that fifteen thousand dollars had been deposited in her account (*Id.*); (13) meanwhile, Green was found dead on the 20th and on the same day Larchick informed Hopkinson of this fact (Tr. Vol. XI, p. 1245); (14) on May 22nd, King received a phone call from a man who identified himself as "Joe" and demanded that she deliver to him the money, which he claimed should have been twenty thousand dollars, that Hopkinson had sent her (Tr. Vol. XII, p. 1634); (15) the man also claimed to have gotten her unlisted phone number from Hopkinson (Tr. Vol. XII, pp. 1617, 1645); (16) King spoke to Hopkinson who begged her to give the money to Joe but when she refused told her to send the money on to his brother, Scott (Tr. Vol. XII, p. 1648); (17) King did send the money to Scott (*Id.*); (18) the day before Green was abducted, Hopkinson attempted to locate a welder (Tr. Vol. XI, p. 1243); (19) a welder may have been used

to heat the metal object with which Green's killers burned him before his death (Tr. Vol. X, p. 1163); and (20) Hopkinson had stated once that he had the ability to arrange to have "individuals fucked-up bodily for life." (Tr. Vol. V, p. 590).

Though Russell claimed that the various money transfers were to buy perjured testimony, there was sufficient circumstantial evidence to impugn this assertion. Thus, because of the conflict in evidence, the jury was entitled to reject that part of his testimony as an attempt to protect himself from a murder charge. *Montez v. State*, Wyo.1974, 527 P.2d 1330.

The record adequately supports the facts as set forth above by the Wyoming Supreme Court. Petitioner asserts that the Wyoming Court never considered other explanations for the set of facts previously summarized. Petitioner asserts that the court did not consider that Jeff Green had only hearsay information against petitioner, that Hickey was the only person posing a threat to petitioner concerning the Vehar murders, that Green had a substantial criminal past and as a result there were many who would consider him a threat, and that the prosecutor warned petitioner's counsel to be leery of any favorable witnesses because petitioner had in fact been seeking to buy perjured testimony in the Mariscal matter.

■ This court cannot agree with petitioner's assertions that the facts supporting the charge for the murder of Jeff Green were flimsey and too insufficient to go to jury. Although the evidence against petitioner was circumstantial, it was more than sufficient to support the charge pertaining to the Green murder. A conviction may be based on circumstantial evidence. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781.

■ Petitioner cites *Rodriguez v. State*, 711 P.2d 410 (Wyo.1985) for the proposition that the Wyoming Supreme Court did not consider evidence in conflict with the state's evidence and did not satisfy constitutional requirements. Therefore, petitioner asserts the finding of the Wyoming Supreme Court that the evidence was sufficient to support petitioner's convictions should not be entitled to a presumption of correctness. In *Rodriguez*, the Wyoming Supreme Court discussed the standard of review for the sufficiency of the evidence. The court stated that:

> When insufficiency of the evidence is argued, we examine and accept as true the evidence favorable to the prosecution leaving out of consideration entirely the evidence favorable to the defendant in conflict therewith, and give the evidence of the prosecution every favorable inference which may be reasonably and fairly drawn therefrom.

*Id.* at 415–416. In a concurring opinion, Chief Justice Thomas clarified that the better way to articulate the standard of review is that "we review *all the evidence* in the light most favorable to the prosecution. As a practical matter we would do exactly what we do now." *Id.* at 416. (Emphasis in original.)

In the instant case, there is nothing in the record which would indicate that the Wyoming Supreme Court did not consider all of the evidence in the light most favorable to the prosecution. The record adequately supports a basis for conviction of petitioner on all counts with which he was charged. This is particularly true when considering the evidence presented in the light most favorable to the prosecution and when considering whether any rational trier of facts could have found the essential elements of the crime beyond a reasonable doubt. Petitioner's assertions concerning other possible explanations for the circumstances surrounding him and Jeff Green are not well-grounded with factual support and are highly speculative. As such, they do not withstand critical review. Issue No. XI of the petition shall be dismissed.

## G. AGGRAVATING CIRCUMSTANCES

Petitioner in issue No. XII of his petition argues that the trial court committed con-

stitutional error in the submission of certain aggravating circumstances to the jury. There are three basic contentions to this argument. First, petitioner argues that resubmission of aggravating circumstances found nonexistent by a previous jury violated the double jeopardy clause of both the United States and the Wyoming Constitutions. Second, petitioner argues that the submission to the jury of the "purpose of avoiding or preventing a lawful arrest" aggravating circumstance violated his eighth and fourteenth amendment rights. Finally, petitioner asserts that submission to the jury of the "heinous-atrocious or cruel" aggravating circumstance likewise violated his eighth and fourteenth amendment rights.

The court will first consider petitioner's argument concerning double jeopardy caused by the resubmission of certain aggravating circumstances to the second sentencing jury. In petitioner's first sentencing proceeding, the jury found four aggravating circumstances applicable to the murder of Jeff Green. The jury, however, failed to find that the Green murder was committed for purposes of avoiding or preventing a lawful arrest or that the murder was committed for pecuniary gain. *See Hopkinson I*, 632 P.2d at 167–68. Upon the resentencing trial, the jury was asked to consider the existence of five statutory aggravating circumstances, including the two aggravating circumstances mentioned above. Petitioner asserts that this resubmission violated the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

■■■■ The double jeopardy clause prohibits the retrial of a defendant for a crime for which he has been acquitted. *See United States v. DiFrancesco*, 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980). The Double Jeopardy Clause does not create an absolute prohibition against the imposition of a harsher sentence at retrial after a defendant has succeeded in having his original conviction set aside. *See Stroud v. United States*, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919). Where a death penalty

sentencing proceeding resembles a trial, the double jeopardy clause will apply where a defendant has been previously "acquitted" on the imposition of that penalty. *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). The court in *Bullington* equated the imposition of a life sentence in the first sentencing proceeding to an acquittal of the defendant on the death penalty for purposes of reconviction. *See also Arizona v. Rumsey*, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984).

■■■■ The issue to be decided in the case at bar concerns the effect to be given to a jury's findings against the application of particular aggravating circumstances, while concluding the death penalty to be applicable for other enumerated statutory reasons. The United States Supreme Court shed some light on this issue in *Poland v. Arizona*, —— U.S. ——, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986). In *Poland*, the Court was faced with the issue of whether the double jeopardy clause bars a further capital sentencing proceeding when, on appeal from a sentence of death, the reviewing court finds the evidence insufficient to support the only aggravating factor on which the sentencing judge relied, but does not find the evidence insufficient to support the death penalty. A brief history of the facts surrounding *Poland* is helpful. The petitioners therein were convicted of first-degree murder. The trial judge then sat as sentencer in a separate proceeding and found that the "especially heinous, cruel, or depraved" aggravating circumstance was present but rejected the "pecuniary gain" aggravating circumstance ruling that it applied only in cases involving contract killings. Petitioners were thereafter sentenced to death. On appeal, the Arizona Supreme Court found the evidence insufficient to support a finding of the "especially heinous, cruel or depraved" aggravating circumstance but ruled that the "pecuniary gain" aggravating circumstance was not limited to situations involving contract killings. At the second sentencing hearing, the prosecution

presented additional evidence and argument that the "pecuniary gain" and "especially heinous, cruel, or depraved" aggravating factors were present. A third aggravating circumstance was also alleged at that time, that being a previous felony conviction involving the use or threat of violence on another person. The trial judge thereafter found all aggravating circumstances present and resentenced petitioners to death.

Petitioners in *Poland* argued that the Arizona Supreme Court's finding of insufficient evidence on the "especially heinous, cruel or depraved" aggravating circumstance amounted to an acquittal of the death penalty. Implicitly, they argued that the trial judge likewise acquitted them of the "pecuniary gain" aggravating circumstance. The Court rejected these arguments and reasoned that under *Bullington,* 451 U.S. 430, 101 S.Ct. 1852 and *Rumsey,* 467 U.S. 203, 104 S.Ct. 2305, the relevant inquiry is deciding whether the prosecution has not proved its case for the death penalty and has therefore "acquitted" petitioners from the imposition of that penalty. *Poland,* 106 S.Ct. at 1755. The Court found that petitioners had failed to establish such an acquittal as to the death penalty. The Court stated:

> We reject the fundamental premise of petitioners' argument, namely, that a capital sentencer's failure to find a particular aggravating circumstance alleged by the prosecution always constitutes an "acquittal" of that circumstance for double jeopardy purposes. *Bullington* indicates that the proper inquiry is whether the sentencer or reviewing court has "decided that the prosecution has not proved its case" *that the death penalty is appropriate.* We are not prepared to extend *Bullington* further and view the capital sentencing hearing as a set of mini-trials on the existence of each aggravating circumstance.
>
> . . . .
>
> Aggravating circumstances are not separate penalties or offenses, but are "standards to guide the making of [the] choice" between the alternative verdicts

of death and life imprisonment. Thus, under Arizona's capital sentencing scheme, the judge's finding of any particular aggravating circumstance does not of itself "convict" a defendant (i.e., require the death penalty), and the failure to find any particular aggravating circumstance does not "acquit" a defendant (i.e., preclude the death penalty).

> It is true that the sentencer must find *some* aggravating circumstance before the death penalty may be imposed, and that the sentencer's finding, albeit erroneous, that no aggravating circumstance is present is an "acquittal" barring a second death sentence proceeding. *Arizona v. Rumsey.*

*Id.* at 1755. (Emphasis in original).

The Court found that the concern with protecting the finality of acquittals was not implicated in a case where the defendant has already been sentenced to death as there is no cause to shield the defendant from further litigation. Also, a rule requiring a reviewing court to ignore evidence in the record supporting an alternate aggravating circumstance previously rejected would force an entry of a death penalty acquittal even though the reviewing court is of the opinion that the state has proved its case. The court summarized its holding as follows:

> We hold, therefore, that the trial judge's rejection of the "pecuniary gain" aggravating circumstance in this case was not an "acquittal" of that circumstance for double jeopardy purposes, and did not foreclose its consideration by the reviewing court. Furthermore, because the reviewing court did not find the evidence legally insufficient to justify imposition of the death penalty, there was no death penalty "acquittal" by that court. The Double Jeopardy Clause, therefore, did not foreclose a second sentencing hearing at which the "clean slate" rule applied.

*Id.* at 1756.

The *Poland* decision clarifies that the resubmission to the jury of the "purposes

of avoiding or preventing a lawful arrest" and the "pecuniary gain" aggravating circumstances in the instant case did not violate the double jeopardy clause as there was no acquittal on the death penalty. The court would note that in *Knapp v. Cardwell*, 667 F.2d 1253 (9th Cir.1982), *cert. denied*, 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982), the Ninth Circuit Court of Appeals had previously reached a similar result when considering a like issue. The court finds that the double jeopardy clause was not violated in this instance as petitioner was not acquitted of the death penalty for the murder of Jeff Green; therefore, resubmission of aggravating circumstances to the jury was proper.

Petitioner's second contention under this section concerns the submission to the jury of the "purpose of avoiding or preventing a lawful arrest" aggravating circumstance. Petitioner asserts that there was insufficient evidence to support this aggravating circumstance as he was already incarcerated at the time of Jeff Green's murder. Petitioner asserts that this aggravating circumstance cannot be equated to mean murder for the purpose of avoiding a conviction because penal statutes are to be strictly construed. Thus, petitioner argues, the tender of this aggravating circumstance to the jury amounted to submission of a nonstatutory aggravating factor.

■ In support of this argument, petitioner points to the Utah death penalty statute, Utah Code Ann., § 76-5-202(1)(e) (1953) which provides as an aggravating circumstance: "The homicide was committed for the purpose of avoiding or preventing an arrest by a peace officer acting under color of legal authority or for the purpose of effecting an escape from lawful custody." Petitioner asserts this provision is indistinguishable from Wyo.Stat. § 6-4-102(h)(v) (1977) which provides: "The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." It is apparent that the language of the Utah statute is much more restrictive than that used in the provision in question here. The

Utah statute has a further provision which states: "The homicide was committed for the purpose of preventing a witness from testifying or a person from providing evidence, or a person from participating in any legal proceedings or official investigation." Utah Code Ann., § 76-5-202(1)(h) (1953). The Wyoming statute has no comparable provision. Petitioner argues that the lack of a comparable provision indicates that the Wyoming legislation did not intend such a provision to apply as an aggravating factor in a capital case. This argument is of questionable relevance and is based on an assumption by petitioner. It is equally plausible to assume that by omitting such a provision and using broader language in Wyo.Stat. § 6-4-102(h)(v), the legislature intended for that provision to encompass both situations.

■ Petitioner also asserts that Wyo. Stat. § 6-4-102(h)(v) is unconstitutional, vague and over broad and further that Instruction No. 5 provided by the trial court to the jury failed to properly channel the jury's sentencing decision. The jury was instructed as to aggravating and mitigating circumstances in Instruction No. 5 as follows:

In determining which penalty is to be imposed on the defendant, you shall consider the evidence which has been presented to you. You shall consider, take into account and be guided by the following circumstances if applicable:

The first such circumstances are called "aggravating circumstances" and in this case are limited to the following:"

1. The murder was committed by a person under sentence of imprisonment.

2. The defendant was previously convicted of another murder in the first degree.

3. The murder was committed for the purpose of avoiding or preventing a lawful arrest.

4. The murder was committed for pecuniary gain.

5. The murder was especially heinous, atrocious or cruel.

The other circumstances are called "mitigating circumstances." They are as follows:

1. The defendant has no significant history of prior criminal activity.
2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.
3. The victim was a participant in the defendant's conduct, or consented to the act.
4. The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor.
5. The defendant acted under extreme duress or under the substantial domination of another person.
6. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
7. The age of the defendant at the time of the crime.
8. Any other circumstances deemed to be mitigating.

(Case No. 747, Vol. V, p. 695.)

The court finds that the above-quoted instruction properly informed the jury concerning the statutory factors to consider in determining the appropriateness of the death penalty.

 As to petitioner's argument concerning vagueness, it is well established that the penalty of death is not to be imposed in an arbitrary and capricious manner. *See Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), *reh'g denied,* 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 164 (1972). A capital sentencing scheme must provide a "meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." *Id.* at 313, 92 S.Ct. at 2764. A death penalty system must not have standards so vague that they would fail to adequately channel the jury's decision resulting in an arbitrary and

capricious sentencing. *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *reh'g denied,* 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976).

 In *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), *reh'g denied,* 456 U.S. 1001, 102 S.Ct. 2286, 73 L.Ed.2d 1296 (1982), the United States Supreme Court found the language "outrageously or wantonly vile, horrible and inhuman" standing alone in a capital punishment case to be unconstitutionally vague. The Court reasoned that nothing in the above-quoted words implied any inherent restraint on the arbitrary and capricious infliction of the death sentence. The same situation cannot be found to exist in the instant case. The language of the aggravating circumstance is sufficiently limited and is not so broad as to become a "catchall" for cases which do not fit within any other aggravating circumstance. The jury was properly channeled and their decision does not reflect an arbitrary and capricious sentence. The court would further note that the record contains sufficient facts in support of the submission of this aggravating circumstance to the jury.

 Petitioner also argues that it was error for the trial court to submit the "heinous, atrocious or cruel" aggravating circumstance to the jury because there was insufficient evidence within the case to establish that petitioner ordered the torture of Jeff Green. Further, petitioner argues that it is clear that the jury did not find beyond a reasonable doubt that he ordered the torture of Jeff Green because the jury considered as a mitigating factor whether "the torture of Jeff Green may not have been ordered by Mark Hopkinson." However, upon closer review, the jury set forth as "other mitigating circumstances" the following:

8. The torture of Jeff Green may not have been ordered by Mark Hopkinson.
Yes___ No X

Rather than indicating that the jury had a reasonable doubt concerning the torture of Jeff Green, the inclusion of the above factor and its specific rejection indicates

that the jury was convinced that the torture of Jeff Green was ordered by petitioner and wished to make this point clear. Further, the court finds that there was sufficient evidence within the record to support the submission of the "heinous, atrocious and cruel" aggravating circumstance to the jury and to support the jury's resulting conclusion. *See Hopkinson II,* 664 P.2d 43 at 59, 72–74.

■ In addition, the case of *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) can be sufficiently distinguished from the case at bar. *Enmund* reversed an imposition of the death penalty on an aider and abettor to a felony (robbery) because the evidence established that the aider and abettor did not kill or intend for a killing to take place. In the instant case, although petitioner was tried as an aider and abettor for the murder of Jeff Green, the evidence has established that petitioner intended for a killing to take place and that torture and lethal force be used. *Enmund* therefore is inapplicable in this case. *See Chaney v. Brown,* 730 F.2d 1334, 1350 (10th Cir.1984), *cert. denied,* 469 U.S. 1090, 105 S.Ct. 601, 83 L.Ed.2d 710 (1984).

■ Petitioner further asserts that the provision in the Wyoming statute concerning the "heinous, atrocious or cruel" aggravating circumstance is unconstitutionally vague and over broad. The court notes that the jury was instructed regarding this aggravating circumstance as follows:

### Instruction No. 10

One of the aggravating circumstances set forth in this case is that the murder was especially heinous, atrocious or cruel. To assist you in your evaluation of this aggravating circumstance, heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included in this circumstance are those capital crimes where the actual

commission of the murder was accompanied by such additional acts as to set the crime apart from the normal murder; that is, a consciousless or pitiless crime which is unnecessarily tortuous to the victim.

(Case No. 747, Vol. V, p. 701).

The language contained within the above-quoted instruction was sufficiently precise to sufficiently guide the jury and to provide a meaningful basis in which to determine whether this was an appropriate case for the imposition of the death penalty. The court properly limited the scope of this aggravating circumstance [*See Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759] and it cannot be concluded that the sentence imposed was arbitrary and capricious. Based on the foregoing, issue No. XII of the petition must be dismissed.

## H. MITIGATING CIRCUMSTANCES: CRUELTY OF THE MANNER OF EXECUTION

■ In issue No. XIV, petitioner asserts that the court's refusal to permit him the opportunity to present evidence of a mitigating circumstance, the cruelty of the manner of execution, denied him his right to due process. The court notes that this issue has not been exhausted in the lower courts; however, as the manner of execution in Wyoming has been changed to lethal injection since petitioner's second sentencing hearing, this issue is now moot and shall be dismissed.

■ In a motion filed by petitioner on July 9, 1986, he seeks to expand this issue to include the claim that the trial court erred in not allowing the defense to introduce in the second sentencing hearing mitigating evidence in the form of an attack on the underlying conviction. He asserts this violated the principles espoused in *Skipper v. S. Carolina,* — U.S. —, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). Petitioner cites *Skipper* for the principle that the sentencer may not be precluded from considering any relevant mitigating evidence and that "any aspect of a defendant's character or record

and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" should be considered as a mitigating factor. *Id.*, 106 S.Ct. 1670–71.

The court cannot conclude that doubts about petitioner's guilt should be considered as a mitigating factor in a sentencing hearing when a prior jury has already resolved any doubts in favor of conviction. The jury in reaching its verdict was convinced of petitioner's guilt beyond a reasonable doubt and the trial court was correct in denying petitioner's request to attack the underlying conviction at petitioner's second trial.

## I. CONSTITUTIONALITY OF WYOMING DEATH PENALTY STATUTE

■ In issue XV, petitioner asserts that his right to due process and to be free from cruel and unusual punishment was violated by the statutory presumption in favor of death under Wyoming law which requires the defendant to bear the burden of demonstrating that sufficient mitigating circumstances outweigh the aggravating circumstances so as to warrant leniency. Petitioner argues that the instructions provided by the court imposed upon him the burden of proving mitigating circumstances and only permitted the jury to recommend life because of the presence of mitigating circumstances which outweigh aggravating circumstances and did not afford the jury the opportunity to be merciful. Petitioner asserts that this situation was in violation of *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

*Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, cannot be read to mean that for a capital sentencing scheme to be constitutional the jury must be given a general opportunity to be merciful. The main concern in evaluating a capital sentencing procedure is whether such procedures allow for a capital sentence to be imposed in an arbitrary and capricious manner. *See Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct.

2909, and *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726. An arbitrary and capricious sentence may be avoided with the careful drafting of a statute that ensures that the sentencing authority is given adequate information and guidance. *Gregg v. Georgia*, 428 U.S. at 195, 96 S.Ct. at 2935. The Georgia statute in issue in *Gregg* was upheld in part because the sentencing decision was sufficiently guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant. *Id.* at 199, 96 S.Ct. at 2937.

Petitioner in the instant case argues that the Wyoming statute is unconstitutional because it does not afford the jury the opportunity to be merciful, as the Georgia statute did. Interestingly, the petitioner in *Gregg* argued against the Georgia statute on that very basis, his argument being that because the jury was given an opportunity to decline to impose the death penalty even if it finds the existence of one or more aggravating circumstances, the requirements of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, were not met. The court rejected that argument, stating:

> Moreover, it [petitioner's argument] ignores the role of the Supreme Court of Georgia which reviews each death sentence to determine whether it is proportional to other sentences imposed for similar crimes. Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice.

*Gregg v. Georgia*, 428 U.S. at 203, 92 S.Ct. at 2939.

If anything, granting the jury the opportunity to impose mercy for no particular reason enhances the arbitrariness of a sentencing decision. This court cannot conclude that the failure of the Wyoming legislature to include such a provision within its capital sentencing scheme violates the

dictates of *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, or the due process clause of the fourteenth amendment

 Petitioner argues that the instructions to the jury in this case imposed upon him the burden of proving mitigating circumstances and only permitted the jury to recommend life because of the presence of mitigating circumstances which outweigh aggravating circumstances. The jury was instructed that:

### Instruction No. 6

Aggravating circumstances must be found beyond a reasonable doubt.

Mitigating circumstances are not required to be proven beyond a reasonable doubt.

(Case No. 747, Vol V, p. 697.)

### Instruction No. 7

If you do not find that one or more sufficient aggravating circumstances exist as previously instructed, you should sign the verdict recommending life imprisonment.

If, on the other hand, you find one or more of the sufficient aggravating circumstances set forth in these instructions, then in order to find that the death penalty is justified, you must find that the aggravating circumstances outweigh any mitigating circumstances found to exist.

In making this determination you must use your reasoned judgment. You must weigh the mitigating circumstances against the aggravating circumstances and in so doing to consider the following:

1. No numerical weight is assigned to any of the mitigating or aggravating circumstances.

2. The enumeration of the aggravating and mitigating circumstances does not indicate the weight to be given to any such circumstance.

3. One mitigating circumstance may be of such a nature as to outweigh one or more aggravating circumstance.

4. One aggravating circumstance may be of such a nature as to outweigh one or more mitigating circumstance.

(Case No. 747, Vol. V, p. 698.)

The court finds that the jury was properly instructed in this instance and further the trial court in no way impermissibly interpreted the statute when charging the jury. The jury had adequate instruction as it pertained to the enumerated aggravating circumstances. As far as mitigating circumstances, the jury was charged to consider those circumstances enumerated in the statute as well as "any other circumstances deemed to be mitigating."

With specific reference to petitioner's argument concerning the shifting of the burden of proof regarding mitigating circumstances, the court would note that other courts considering this argument have rejected it. In *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979), the court therein noted that while the state has the burden of proof in a criminal case, when the issue of guilt has already been decided and only the question of punishment remains, due process is not offended by requiring an already guilty defendant to carry the burden of establishing why he should receive leniency. *Id.,* 586 P.2d at 1259. The court reasoned that to require the state to negate every mitigating circumstance would place an impermissible burden on the state. *Id.* A like result was reached in *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980).

In *State v. Wood,* 648 P.2d 71 (Utah 1982), the court therein restated its holding in *State v. Pierre,* 572 P.2d 1338 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978), that due process does not require the state to prove beyond a reasonable doubt the absence of any mitigating factors which may be raised by the defendant. The court reasoned that any other rule would serve to make its sentencing statute unworkable as a defendant could raise any number of mitigating factors, making it virtually impossible for the prosecution to disprove them all.

In *Jackson v. Wainwright*, 421 So.2d 1385, 1389 (Fla.1982), *cert. denied*, 463 U.S. 1229, 103 S.Ct. 3572, 77 L.Ed.2d 1412 (1983), the court therein aptly stated:

> Mitigating circumstances are not offered as rebuttal evidence of aggravating circumstances. Mitigating circumstances, if any, are offered by the defendant to show that the 'totality of circumstances' warrants less than the death penalty. There is no improper 'shifting' of the burden of persuasion with respect to a fact which must be proved during the sentencing procedure.

*Id.*

■ In conclusion, the court finds that the statutory scheme in issue here in no way impermissibly shifts the burden of proof with respect to mitigating circumstances. It would be unreasonable to place the burden on the state to prove the absence of mitigating circumstances. A defendant in a capital sentencing proceeding is in a different posture than one who is facing a trial on the question of guilt or innocence. While due process concerns are equally important and the state still has the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances, due process is not offended by the requirement that the defendant make some show for leniency. It follows that issue No. XV of the petition must be dismissed.

## J. PROSECUTOR'S ARGUMENT AT SECOND PENALTY HEARING

■ In issue No. XVIII, petitioner argues that the prosecutor's argument at the second penalty hearing created a constitutionally unacceptable risk that the death penalty was imposed arbitrarily or capriciously. Petitioner asserts that the prosecutor impermissibly informed the jury of their role in determining the responsibility they had concerning imposition of the death penalty. Further, petitioner asserts that the jury was not correctly instructed concerning their role. Petitioner views as objectionable the following argument:

Another matter, they talked about the possibility of error. There is no such thing as perfection. This system works to the best it can, but there are safeguards built in. That's due process. The Wyoming Supreme Court, as Mr. Munker said, reviewed the first trial. They found no error in the guilt phase. That went to the United States Supreme Court, and it was denied cert.

MR. SKAGGS: Objection, Your Honor. There is flatly no evidence of that and if I can't bring in something there is no evidence of, he can't either.

MR. MORIARITY: Well—

THE COURT: Now, let me try and handle it. The jury has heard a lot of statements in closing arguments with reference to matters which technically there is no evidence on. And I won't talk about who said what, that's strictly up to you. But I have given everybody wide latitude and I'm not going to stop now. The jury will just sift it out.

MR. MORIARITY: Thank you, Your Honor.

The testimony of Mrs. Barbara Oakley, the clerk of this court, when I asked her if the guilt phase had gone to the United States Supreme Court and had come back from them prior to this testimony, she said, yes, the record revealed that. That is the facts in this case. But the Wyoming Supreme Court sent it back because of error in the first trial on the death penalty as it pertained to the Jeff Green matter. The Wyoming Supreme Court will review whatever action you take in this case. It's an automatic review. So, the matter of error, the matter of mistake is not one for us to be concerned with here. Judge Ranck has done his best, his duty to instruct you on the law. We have given you the facts from the witness stand as best we can. You have to do your duty as best you can, and I'm sure you will. But because of some possibility of error, they say don't give him the death penalty. That's not

what the law is. It's nowhere in your instructions from the Court.

(Tr. Vol. XII, p 1246–47.)

In *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the United States Supreme Court considered the issue of whether a capital sentence is valid when the sentencing jury is led to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case. The petitioner in that case made the following argument:

> [E]very life is precious and as long as there's life in the soul of a person, there is hope. There is hope, but life is one thing and death is final. So I implore you to think deeply about this matter. It is his life or death-the decision you're going to have to make, and I implore you to exercise your prerogative to spare the life of Bobby Caldwell.... I'm sure [the prosecutor is] going to say to you that Bobby Caldwell is not a merciful person, but I say unto you he is a human being. That he has a life that rests in your hands. You can give him life or you can give him death. It's going to be your decision. I don't know what else I can say to you but we live in a society where we are taught that an eye for an eye is not the solution.... You are the judges and you will have to decide his fate. It is an awesome responsibility, I know—an awesome responsibility.

*Id.*, 105 S.Ct. at 2637.

The prosecutor then responded:

> ASSISTANT DISTRICT ATTORNEY: Ladies and gentlemen, I intend to be brief. I'm in complete disagreement with the approach the defense has taken. I don't think it's fair. I think it's unfair. I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it. Yet they ...
>
> COUNSEL FOR DEFENDANT: Your Honor, I'm going to object to this statement. It's out of order.
>
> ASSISTANT DISTRICT ATTORNEY: Your Honor, throughout their argument, they said this panel was going to kill this man. I think that's terribly unfair.
>
> THE COURT: All right, go on and make the full expression so the jury will not be confused. I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands. I think that information is now needed by the jury so they will not be confused.
>
> ASSISTANT DISTRICT ATTORNEY: Throughout their remarks, they attempted to give you the opposite, sparing the truth. They said "Thou shalt not kill." If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bob Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so.

*Id.* at 2637–2638. The United States Supreme Court found such comments by the prosecution to have resulted in a sentence that did not meet the standard of reliability required by the eighth amendment. The Court reasoned that the eighth amendment assumes that capital sentencers would view their task as the serious one of determining whether an individual should die at the hands of the state and that it is unconstitutional to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for such a decision rests elsewhere.

The Court expressed its main concerns against the shifting of such responsibility as follows: (1) bias against the defendant might result because jurors might not understand the presumption of correctness and scope of limited appellate review; (2) a jury, unconvinced that a death sentence is warranted, might wish to send a message

of extreme disapproval; (3) bias against the defendant might stem from the fact that some jurors might correctly assume that a life sentence could not be increased to a death sentence on appeal; and (4) the jury may choose to minimize the importance of its role.

The Court found the prosecutor's argument in *Caldwell* to be inaccurate because it was misleading as to the nature of appellate court review and was irrelevant to the determination of an appropriate sentence. The Court failed to find the comments of the prosecution to fall within the ambit of an "invited response" because they were not related to defense counsel's references to show mercy or the consequences that would flow from a life sentence. The Court concluded that the state sought to minimize the jury's sense of responsibility for determining the appropriateness of death in violation of the basic premise that a capital sentencing jury recognize the gravity of its task and proceeds with the appropriate awareness of its "truly awesome responsibility".

The case at bar can be fairly distinguished from *Caldwell*. The comments of the prosecution must be taken in their proper context. *See United States v. Young*, 105 S.Ct. 1038. As such they were not misleading to the jury concerning the extent of their responsibility. Further, the court would note that defense counsel several times alluded to the finality of mistake in the instant case. Counsel for defendant first mentioned that the trial judge made a mistake in petitioner's previous case while alluding to how careful and fair the trial judge was. (Tr. Vol. XII at 1203.) Defense counsel again referred to the question of mistake by stating: "Your decision in this case has to be free of caprice, free of mistake...." (Tr. Vol. XII at 1213.) Along the same line, counsel stated:

> And that fear that Mr. Moriarity talked about, and that fear that I talked to you about on opening argument is still with me. And it's still there, and it's still deep down here because I fear that I have done something or said something

that would make you angry. I fear that I may have left something out that would be of critical importance; I'm scared that I may not have prepared the case properly; and I'm scared that despite what I do in this courtroom, my word means so little. That Mark Hopkinson, as he sits there a man helpless, who has given his life to us, who has given his life to place in our hands because he can't do the legal thing; he can't do anything; he doesn't have any legal decisions really to make. I or Mr. Munker make all of them.

(Tr. Vol. XII at 1234.)

Finally, the comment was made:

> I think probably the most compelling argument, though, against the death penalty, is the possibility of mistake; and I'm sure that most of you have read that throughout a recorded history there have been executions and it has came [sic] to light afterwards that individuals had not committed the crimes they had been charged with. I think that that possibility is diminishing, and I'll be honest with you in telling you that. I don't like to tell you that, but it's diminishing because we have more intelligent juries nowadays than we had back then. And we have right to counsel, and that sort of thing. But it still can happen.

(Tr. Vol. XII at 1239.) Viewed in their proper context, in light of the entire proceeding and comments by the defense, the comments of the prosecution cannot be viewed as misleading or constitutionally improper.

 The jury was instructed by the trial court concerning the significance of their role and the sentencing procedure as follows:

### Instruction No. 8

In order for the defendant to receive the death penalty in this case, the jury must unanimously recommend the death penalty. If the jury is unable to unanimously agree upon the penalty within a reasonable time, the Court will sentence the defendant to life imprisonment.

You should not act hastily or without due regard for the gravity of these proceedings. Before you ballot, you should carefully weigh, sift and consider the evidence and all of it and bring to bear your best judgment upon the sole issue which is submitted to you at this time: Whether the defendant shall be sentenced to death or to life imprisonment.

Your decision as to the sentence to be imposed is mandatory. You are not merely recommending a sentence to the Judge. You are the final decision-makers as to whether Mark Hopkinson will be sentenced to life in prison or to death. (Case No. 747, Vol V, p. 699.)

*Instruction No. 11*

You are instructed that under the State Constitution a Governor is empowered to grant reprieves, commutations and pardons after conviction of a crime. (Case No. 747, Vol. V, p. 702.)

These instructions were in no way misleading and correctly informed the jury of its role within the sentencing scheme. *Caldwell,* 105 S.Ct. 2633 cannot be read to mean that a jury may not be accurately instructed regarding sentencing and post-sentencing procedures. *Id.* at 2646 (O'Connor, J., concurring). Issue No. XVIII shall be dismissed.

### K. POST–CONVICTION PROCEDURE

■ In issue No. XXI of his petition, petitioner states that the post-conviction procedure established by the Wyoming Supreme Court in *Hopkinson IV,* 696 P.2d 54, violates due process. Petitioner asserts that he has been denied an opportunity to present his constitutional arguments to the state courts. In particular, petitioner argues that the procedure set forth in *Hopkinson IV* violates due process because the court therein held the rules of civil procedure to be inapplicable to petitioner's case by ruling that affidavits based upon information and belief were insufficient to be accorded any consideration and that petitions for post-conviction relief must have all affidavits attached in support of the petition. Petitioner argues that it is not

fair to expect an inmate to obtain the necessary documentation and also that equal protection is violated by obstructing a convicted person's access to the courts by requiring verification. Petitioner also asserts that he is not receiving due process because he cannot get the Wyoming Supreme Court to address certain issues and therefore he has no meaningful access of review.

The court finds this argument to be meritless. The Wyoming Supreme Court opinion in *Hopkinson IV* is not violative of due process and does not deprive petitioner of a meaningful review. In *Hopkinson IV,* the Wyoming court found appellant's petition for post-conviction relief to lack specific explanation and to be framed in only bold conclusions without reference to any evidentiary support. Further, the court found the petition for post-conviction relief to be a petition filed in connection with a criminal matter, distinctive from a civil case. In addition, the court found the affidavits of petitioner's attorney and investigator to contain no "fleshing-out" facts and to be of inferior and unacceptable quality as they were based only on information and belief in that affiants had no personal knowledge of the facts set out. The court then went on to consider the claims made in appellant's petition for post-conviction relief. Petitioner was in no way deprived of a meaningful review in *Hopkinson IV* or in any other of the numerous opinions by the Wyoming Supreme Court on this matter.

■ Additionally, while appellate review must comport with due process requirements [*see Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985)], alleged defects in state post-conviction proceedings do not raise a constitutional question for purposes of habeas corpus review. *Bradshaw v. State of Oklahoma,* 398 F.Supp. 838 (E.D.Okla.1975). It follows that issue No. XXI of the petition must be dismissed.

### L. MITIGATING FACTORS SUBSEQUENT TO SENTENCING

■ In issue No. XXII, petitioner asserts that capital defendants are not af-

forded the same opportunity to present new material to the court and to seek a sentence reduction as are non-capital defendants. Petitioner argues that procedural safeguards afforded non-capital defendants are not applied in a capital case.

In *Hopkinson V*, 704 P.2d 1323, the Wyoming Supreme Court concluded that a district judge has no jurisdiction to reduce a death sentence under Rule 36, Wyoming Rules of Criminal Procedure. The court found the clear, mandatory statutory language of Wyo.Stat. 6–2–102(f) to leave no discretion with the trial judge, who is bound by the jury's decision, absent the existence of an illegally imposed sentence. The court reasoned that Rule 36, as a court rule, cannot override the legislative directive. Further, the jury system for determining the appropriateness of the death penalty as opposed to life imprisonment is an integral part of the total constitutionally approved sentencing structure prescribed by the Wyoming legislature in compliance with United States Supreme Court guidelines. Although the Wyoming Supreme Court has statutory authorization to set aside the death sentence under Wyoming Statute 6–2–103(e), the court did not feel resentencing to be warranted in the instant case.

Petitioner can cite no authority in support of his position. While a non-capital defendant may resort to the trial judge for a sentence reduction pursuant to Rule 36, the capital defendant is entitled to numerous other procedural safeguards. There is no denial of equal protection or due process under these circumstances. *See State v. Cheadle*, 102 N.M. 743, 700 P.2d 646 (1985). Issue No. XXII shall be dismissed.

## M. TRIAL ATMOSPHERE

In issue number IV of his petition, petitioner asserts that the prejudicial atmosphere surrounding his trial deprived him of his due process rights. Petitioner argues that the extensive security measures taken during his trial and which were observable by the jury constituted evidence of his guilt and amounted to plain error. Petitioner asserts that this issue is a factual one and that a hearing is required to complete the picture to allow the court to make appropriate findings.

In *Holbrook v. Flynn*, —— U.S. ——, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), the United States Supreme Court considered the issue of whether a criminal defendant was denied his constitutional right to a fair trial when, at his trial with five co-defendants, the customary security force was supplemented by four uniformed state troopers sitting in the first row of the spectator section. The Court found in the first instance that the deployment of security personnel in a courtroom during trial is not the sort of inherently prejudicial practice that should be permitted only where justified by an essential state interest specific to each trial. The Court noted that the presence of guards need not be interpreted as a sign that the defendant is particularly dangerous or culpable as society has become inured to the presence of armed guards in most public places. Because of the variety of ways in which guards can be deployed, the Court adopted a case-by-case approach. The Court then focused on the question of whether the presence of the four uniformed guards was so inherently prejudicial as to deny the defendant his constitutional right to a fair trial. In evaluating this question, the Court considered not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether an unacceptable risk of impermissible factors coming into play is present. The Court concluded that the presence of the guards did not create an unacceptable risk of prejudice. Further, even if a slight degree of prejudice was attributable to the presence of the guards at trial, such presence was sufficiently related to a legitimate state interest; therefore, equal protection concerns were not offended. A federal court, when reviewing a constitutional challenge to a state court proceeding should "look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to

defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Id.* at 1348.

 Petitioner in the instant case argues that a general atmosphere of anxiety and fear was present throughout his trial and that abundant evidence of this exists in the transcript of voir dire. Petitioner has attached a number of exhibits in support of his assertions. The affidavits petitioner relies on are couched in general conclusionary terms and contain many hearsay statements. The affidavit of Robert VanSciver, petitioner's attorney during the trial in question, states generally that the security was intended to arouse fear. However, the affidavit does not refer to any specific security measures as they related to the jury. The affidavit refers only to the special prosecutor's "tactics," as well as "rumors" and "common knowledge" within the area. This is insufficient to support petitioner's assertions. Likewise, the numerous newspaper articles attached as exhibits are of questionable relevance and are not really probative to the issue at hand.

 The affidavit of Ronald J. Yengish that he was "impressed with the show of force surrounding the trial itself and the number of bodyguards and other security personnel who participated in the trial" and that he "never in eleven years experience in the practice of law experienced the feeling and aura of fear engendered by such security forces" is vague and conclusionary. There is no indication of any exposure to the jury of any abnormal security measures.

 The affidavits of Norman Newlon (Exhibits M, N & R) are general and conclusionary and lack an adequate factual basis to support petitioner's arguments. In addition, portions of Newlon's affidavits, as well as the affidavit of Muriel J. Smith are based on hearsay.

The affidavit of Lin Bashford is of questionable relevance to the issue at hand as it does not pertain to the question of security

measures at petitioner's trial. The record is likewise devoid of support for petitioner's assertions. There is no indication that the security measures were so extreme as to deny petitioner of the right to a fair trial. Any jurors who, during voir dire, expressed concern about the circumstances of the trial were subsequently excused. There is nothing in the record on which the court can conclude that the security measures employed during petitioner's trial were so inherently prejudicial that he was denied his constitutional right to a fair trial. Likewise, petitioner has failed to show actual prejudice as a result of any security measures taken.

On voir dire, counsel for petitioner made reference to the security measures as follows:

The mere fact that there are 8 matrons or 4 matrons and 4 guards and that there is 24–hour surveillance and some people have bodyguards, does that lead any of you to believe one way or the other with respect to guilt?

(Tr. Vol. I at 196).

The court subsequently responded:

The reason there are 8 bailiffs is because it's very difficult for two bailiffs to handle a jury 24 hours a day. Period. That's why. There will be shifts of bailiffs and somebody gets a day off. That's why there are 8 bailiffs and the only reason.

(Tr. Vol. I at 197).

 With reference to petitioner's arguments concerning the court's order that no sketches were to be drawn or photographs taken of Jim Taylor, the court notes that when read in its proper context, no prejudice could result from such a statement. *See* Tr. Vol. VI at 746–47. The judge at that time likewise ordered no drawings to be made of the petitioner or the attorneys as well. Concerning Mike Hickey's testimony about wearing a bulletproof vest, the court cannot conclude that this testimony in any way contributed to a prejudicial atmosphere surrounding the trial. The statement was made during questioning concerning his fear and motivation

for testifying against petitioner. *See* Tr. Vol. VIII at 1227–28.

Based on the foregoing, issue No. IV of the petition shall be dismissed.

### N. SUESATA TESTIMONY

■ In issue No. VI of the petition, petitioner argues that his sixth amendment rights were violated by the procedure employed at trial permitting John Suesata to invoke the fifth amendment in the presence of the jury. Petitioner asserts that in light of the prosecution's close ties to Suesata, his invocation of the fifth amendment in the jury's presence was a sham and deprived petitioner of his confrontation rights.

Prior to Mr. Suesata's being called to the witness stand, proceedings were held in chambers wherein defense counsel objected to Mr. Suesata's being called as a witness because of the prosecutor's awareness of the likelihood that he would invoke the fifth amendment (Tr. Vol. XII, p. 1579–90). The prosecution advised the court that although Mr. Suesata would likely take the fifth amendment on some areas of questioning, there would also be many areas in which he could not be challenged with the fifth. (Tr. Vol. XII, p. 1582–1594). When he was called to the witness stand, Mr. Suesata testified as follows:

Q. Would you state your name to the ladies and gentlemen of the jury, please?

A. John Lewis Suesata.

Q. Where do you live?

A. Salt Lake City, Utah.

Q. How long have you lived there?

A. All my life.

Q. What do you do?

A. (Brief pause) I refuse to answer on the ground that it may tend to incriminate me.

Q. Well, is everything that you do, would that incriminate you? Are there some things that you do that wouldn't incriminate you?

MR. VAN SCIVER: I object to the form of the question.

THE COURT: Sustained.

MR. SPENCE: On the grounds that I haven't been shown as a hostile witness yet?

THE COURT: No.

MR. SPENCE: May I lead?

THE COURT: Not yet.

Q. (By Mr. Spence) All right. Mr. Suesata, you're here because of some arrangements that have occurred or taken place that started with the Federal Grand Jury; is that correct?

A. (Brief pause) I refuse to answer on the ground that it may tend to incriminate me.

Q. Well, have you been subpoenaed to a Federal Grand Jury?

A. (Brief pause) I refuse to answer on the grounds that it may tend to incriminate me.

Q. Do you know me?

A. Yes, sir.

Q. Where did you first meet me and when?

A. (Brief pause) I refuse to answer on the ground that it may tend to incriminate me.

THE COURT: You may now ask leading questions.

Q. (By Mr. Spence) Thank you. Isn't it true that your first met me yesterday in my office in the morning?

A. (Brief pause) I refuse to answer on the gounds it may tend to incriminate me.

Q. And prior to yesterday morning the only other time that you and I had contact was a telephone call when you called Mr. Moriarity at our office in Jackson; isn't that true?

A. (Brief pause) I refuse to answer on the ground it may tend to incriminate me.

Q. Do you know Todd Hall?

A. (Brief pause) I refuse to answer on the ground it may tend to incriminate me.

(Tr. Vol. XII, pp. 1595–1597).

Whereupon the questioning was stopped and the jury was excused.

Petitioner asserts that Mr. Suesata was a witness who gave evidence against him without being subject to cross-examination. The court cannot agree.

The pivotal case concerning the invocation of the fifth amendment by a witness during a criminal trial is *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). In that case, the prosecution asked certain questions concerning the witness' relationship with the accused, while knowing that the witness would invoke the fifth amendment. The United States Supreme Court noted the theories relied on by lower courts in concluding that reversible error does not always exist whenever a witness claims his privilege not to answer. The lower courts used the following theories in deciding this issue, first whether there was prosecutorial misconduct, as when the government makes a conscious and flagrant attempt to build its case out of inferences arising from the use of the fifth amendment and secondly, whether under the circumstances of a given case, inferences from a witness' refusal to answer amounts to added critical weight to the prosecution's case in a form not subject to cross-examination. *Id.* at 186–87, 83 S.Ct. at 1154–55. Rejecting the notion of prosecutorial misconduct, the Court noted that the prosecution need not accept at face value every asserted claim of privilege and further, the prosecution believed that the witnesses could not properly invoke the fifth amendment under the circumstances involved therein. The Court further found that the few invocations of privilege existing during the trial were so insignificant that they could not constitute reversible error, even in the absence of prosecutiorial misconduct.

These two factors to be considered in determining if reversible error occurred has been succinctly stated in *United States v. Harper*, 579 F.2d 1235 (10th Cir.1978), *cert. denied*, 439 U.S. 968, 99 S.Ct. 459, 58 L.Ed.2d 427 (1978):

One concerns possible prosecutorial misconduct in calling the reluctant witness. The other focuses on what, if any, preju-

dicial effect the witness' refusal to answer might have had.

*Id.* at 1240.

The court in *Harper* found the defendant was not deprived of his right to confront witnesses under the circumstances therein.

In the instant case, petitioner seeks to build a case of prosecutorial misconduct caused by putting Mr. Suesata on the witness stand while knowing that he would invoke the fifth amendment. Mr. Suesata was alleged to be involved in wrongdoing under both the prosecution's and the petitioner's theories. The extent and nature of the wrongdoing was the disputed point. The prosecutor reasonably believed that the nature of many of his questions would be of the type in which Mr. Suesata would not invoke his testimonial privilege. The court has carefully reviewed petitioner's supporting affidavits and finds that they offer no credible evidence to support petitioner's theory of prosecutorial misconduct.

Secondly, the questions the prosecutor put to Mr. Suesata did not add critical weight to the prosecution's case and were relatively insignificant in the overall framework of the trial. Further, the prosecutor's comments in closing arguments concerning Mr. Suesata were nonprejudicial and relatively minor. (Tr. Vol. XIV, p. 1803). The prosecution made no attempt to buttress its case with any impermissible inferences. In view of all the circumstances existing in this case, it was not error for Mr. Suesata to invoke his privilege against self-incrimination in the presence of the jury. Issue No. VI of the petition shall be dismissed.

## O. MISLEADING TESTIMONY

In issue No. XVI of the petition, petitioner argues that he was deprived of due process by the use of grossly misleading testimony by the prosecution during the second penalty hearing. Petitioner refers to the testimony of Sheriff Leonard Hysell that the arrests of the killers of Jeff Green were imminent. The testimony was as follows:

Q. Sheriff, yesterday some questions were asked of you as to the fact of whether or not Jeff Green knew the individuals who took him from his home on the morning of May 18, 1979. Do you recall those questions?

A. Yes, sir, I do.

Q. What are the circumstances that you developed in that regard?

A. Prior to Jeff's disappearance, Jeff had related to me on several occasions that he had concerns for the safety of his family. And our theory at the time he was abducted was that, number one, that he had fear for the safety of his mother who was in the house, and also that it's possible that he had a gun on him since he eventually was shot with a gun.

Q. So, there was no question that the individuals who took him had a gun?

A. None whatsoever.

Q. Incidentally, some questions were asked regarding whether or not an individual or individuals had been arrested for the killing of Jeff Green. You recall those questions, Sheriff?

A. Yes.

Q. Are arrests about to be made in that case?

A. Yes, they are.

MR. MORIARITY: May I approach the bench for a minute for some guidance from the Court, your Honor?

THE COURT: Okay.

(Whereupon, a brief discussion was had at the bench, off the record.)

Q. (By Mr. Moriarity) Sheriff Hysell, would you tell the Court and the jury why the arrests have not been made?

MR. SKAGGS: Objection, your Honor. It's irrelevant. It goes into grand jury matters. It's outside the scope of direct.

THE COURT: Well, I'm going to sustain it on some ground.

(Tr. II, Vol. V, p. 933–935).

Petitioner asserts that on the basis of this testimony, the jury could infer that the prosecution knew who Jeff Green's killers were and knew of their connection to the petitioner. Petitioner argues that the prosecutor and Sheriff Hysell knew there was insufficient information in which to believe arrests were imminent and further, defense counsel was misled by being told the names of the alleged killers, that their arrests were imminent and that the state would wait until the conclusion of the sentencing hearing to arrest the killers to ensure a fair hearing for petitioner. Petitioner asserts that because of this, his counsel was obliged to object when the prosecutor inquired of Sheriff Hysell why the arrests had not been made.

Due process requires an "exercise of judgment upon the whole course of the proceedings leading to the conviction in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offense." *Rochin v. California,* 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952). "Due process of law is a summarized constitutional guarantee of respect for those personal immunities which ... are so rooted in the traditions and conscience of our people as to be ranked as fundamental, or are implicit in the concept of ordered liberty." *Id.*

The court cannot conclude that due process was violated in this instance. Petitioner has failed to establish that the prosecution knowingly used misleading testimony concerning the imminent arrest of Jeff Green's killers. Further, petitioner has failed to establish that a hearing is necessary on this issue. *See Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and *Dickson v. Wainwright,* 683 F.2d 348 (11th Cir.1982). As his allegations concerning improper actions on the part of the prosecution are merely speculative, the court cannot conclude that the prosecution behaved dishonestly because the arrests of Jeff Green's killers did not follow petitioner's hearing as any number of circumstances could have intervened, thus preventing the arrests. Additionally, the court cannot

agree that defense counsel at the second penalty hearing was deprived of the right to rebut the testimony concerning the imminent arrest of Jeff Green's killers as counsel's objection to the question concerning why these killers had not yet been apprehended was a tactical decision. It follows that issue No. XVI of the petition shall be dismissed.

## P. SUPPRESSION OF EXCULPATORY EVIDENCE

In issue No. VII of his petition, petitioner asserts that the prosecution's suppression of mitigating evidence violated his right to due process. Petitioner asserts that exculpatory evidence relating to John Suesata's involvement as a government informant was suppressed, as well as evidence pertaining to Mike Hickey and Jeff Green's involvement in the Vehar bombing. Further, petitioner asserts that the prosecution knowingly used Mike Hickey's perjured testimony, suppressed impeaching material, and failed to disclose exculpatory evidence pertaining to the investigation of Jeff Green's unknown murderers. Petitioner also asserts that exculpatory material could be found in the testimony presented to the Uinta grand jury and to a federal grand jury. Petitioner also claims interference in the discovery process caused by the prosecution's instructing witnesses not to talk to the defense. In addition, petitioner claims exculpatory evidence concerning Vince Vehar's discovery of a million dollar scam involving Uinta and Lincoln County public officials was not disclosed, and such information could have been used to form motive on the part of others, as well as for impeachment purposes. The above-referenced arguments all relate to exculpatory material which petitioner asserts should have been disclosed at his first trial.

The United States Supreme Court in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment,

irrespective of the good faith or bad faith of the prosecution. The Court in *Brady* found that the exculpatory material withheld would not have affected the outcome of the case on the issue of guilt but could have affected the punishment; therefore, although the entire trial was not lacking in due process, the punishment imposed was constitutionally infirm.

A later case, *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) elaborated on the *Brady* decision. In *Agurs,* the United States Supreme Court discussed three situations concerning exculpatory material. Where the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew or should have known of the perjury, then such a conviction is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Noting that *Brady* involved a specific request for exculpatory evidence in that it gave the prosecution notice of exactly what the defense desired, the Court reasoned that in such situations the prosecution must make some response. "[I]f the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge." *United States v. Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399. In situations involving a general request, such as asking for "all *Brady* material" or "anything exculpatory", any duty on the prosecution to respond to such a request must derive from the "obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made." *Id.* at 107, 96 S.Ct. at 2399. The Court stated that the issue centers around a defendant's right to a fair trial and the prosecutor will not have violated his constitutional duty of disclosure unless his omission is

of sufficient significance to deprive defendant of due process.

The Tenth Circuit Court of Appeals in *Chaney v. Brown,* 730 F.2d 1334 (10th Cir.1984), *cert. denied,* 469 U.S. 1090, 105 S.Ct. 601, 83 L.Ed.2d 710 (1984), concisely set forth the three situations in which the question of materiality of evidence in the prosecution's control would arise, as follows:

First, where the prosecutor has knowingly used perjured testimony, the judgment must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Second, where defendant has made a specific pretrial request for exculpatory evidence, the judgment must be set aside if "the suppressed evidence might have affected the outcome of the trial." Third, where defendant has made "a general request for *Brady* material," or has made no request at all, the judgment must be set aside "if the omitted evidence creates a reasonable doubt that did not otherwise exist."

*Id.* at 1339–40 (citations omitted). The Court in *Chaney* found that the defendant made a specific request and the withheld evidence might have affected the sentencing decision and therefore found the death sentence to be invalid. The nondisclosed evidence consisted of FBI reports which could have raised an inference that others were involved in the kidnappings and murders and that defendant did not do the actual killings.

A later United States Supreme Court case, *United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) discussed the nondisclosure of exculpatory impeachment evidence. In *Bagley,* the prosecution withheld information concerning the possibility of a reward which had been held out to two government witnesses if they supplied information which led to the "accomplishment of the objective sought to be obtained ... to the satisfaction of the Government." *Id.,* 105 S.Ct. at 3384. Further, when defendant specifically requested "any deals, promises or induce-

ments made to witnesses in exchange for their testimony", the prosecution responded with affidavits of the witnesses that they received no promises of reward in return for testimony. The Court reasoned that although the affidavits were technically correct, they were misleading to the defendant in inducing him to believe that the witnesses could not be impeached on the basis of bias or interest.

The Court in reversing the conviction noted that failure to disclose impeachment evidence does not require automatic reversal. Such nondisclosure requires reversal only if the evidence is material in that it might have affected the outcome of the trial. *Id.* at 3382–83.

In *Bagley,* the Court established a single test applicable to all instances of nondisclosure:

The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

*Id.* at 3383. *See also, Bowen v. Maynard,* 799 F.2d 593 (10th Cir.1986) (declining to rule on the retroactivity of *Bagley* ).

In the instant case, attached as Exhibit E to the petition for habeas corpus are the petitioner's pretrial motions for discovery. Included within these motions are the following requests for:

2. Statements by any person inculpating a person or persons other than the defendant in the aforementioned homicides, or statements exculpating the defendant. These statements should include but not be limited to statements made by persons to news media, law enforcement officials, private investigators and prosecutors.

3. Threats made by any person against Vincent Vehar, Beverly Vehar, John Vehar, or Jeffrey Green after January 1, 1976. This request includes the identity and address of the person making the threat.

. . . .

6. The details of any plea bargain reached between the State of Wyoming and Harold James Taylor concerning the alleged conspiracy to kill Vincent Vehar by gunshot.

7. Any statements of Harold James Taylor exculpating the defendant from participation in the aforementioned conspiracy.

. . . .

13. Any statements of Jeff Green or any other person consistent with defendant's testimony to the Uinta County Grand Jury that he once loaned Green a car to drive to Salt Lake City for business reasons.

14. Statements or testimony of any persons consistent with the defendant's and Jeff Green's implication of Jamey Hysell in the death of Kellie Wyckhuyse.

. . . .

16. Copies of all law enforcement reports of investigations into the participation by persons other than the defendant in the offenses which have been charged against him.

. . . .

22. Testimony of Jeffrey Green at the Jamey Hysell trial to the effect that he falsely testified against Hysell to benefit himself.

In support of his position that exculpatory evidence has been withheld, petitioner has attached grand jury testimony of Harold Jimmy Taylor to his petition, as well as affidavits attached to a motion to amend traverse filed on January 29, 1986. Also attached are exhibits U, V, W and X pertaining to John Suesata and Exhibits D–1, D–2, D–3, D–6, E–1, E–2, G, H, I, J and K pertaining to Jeff Green and others.

■ Petitioner asserts that the grand jury testimony of Harold Jimmy Taylor is both impeaching and exculpatory. Petitioner argues that the testimony of Mr. Taylor at trial cannot be reconciled with his grand jury testimony, therefore reliance on his testimony for a conspiracy conviction and the murder convictions was misplaced. Before the grand jury, Mr. Taylor testified

that he was approached by petitioner in December, 1976, to "beat up" Vincent Vehar. Petitioner explained to Mr. Taylor that he wanted to throw a scare into Mr. Vehar to get him off a case he was working on. In January, 1977, petitioner then asked Mr. Taylor how Vince Vehar could be killed and Mr. Taylor responded that he would not help him. Mr. Taylor later testified that when he took the money from petitioner, he had no intention of beating up Mr. Vehar. At trial, Mr. Taylor testified that he took money from petitioner to kill Mr. Vehar but failed to complete the job because Mr. Vehar was being guarded.

The grand jury testimony of Mr. Taylor would fall within the ambit of pretrial request No. 7 listed above, therefore the question of materiality of this information under *Agurs* must be determined on the basis of whether the suppressed evidence might have affected the outcome of the trial. Had the grand jury transcript been withheld from petitioner, the court would likely have concluded that the testimony might have affected the outcome of the trial as it pertained to petitioner's conviction for conspiring with Taylor to murder Vince Vehar. However, the record does not support petitioner's assertions that this material was withheld. In fact, during the defense's cross-examination of Harold Taylor at trial, defense counsel reads from the grand jury transcript. (Tr. Vol. VI at 735–736). There is no basis in the record to support petitioner's assertions on this issue.

■ Exhibits U, V, W and X all pertain to petitioner's argument that he was never informed of John Suesata's involvement as a government informant. The above-referenced exhibits are affidavits which are conclusionary and based on hearsay. The affidavits are so general that they fail to contain any information in support of petitioner's assertions.

■ Exhibits D–1, D–2, D–3, D–6, E–1, E–2, G, H, I and J pertain to statements made by Jeff Green. Petitioner asserts that these statements indicate that Green

was notoriously unreliable and further, that someone else other than petitioner could have wanted him dead. It appears that petitioner is referencing a phone call between Jeff Green and his attorney to the effect that he was afraid to testify against Hysell. Viewing the nature of the statements contained within these exhibits, the court cannot conclude that they could have affected the outcome of the trial, much less create a reasonable doubt. Even under *Bagley*, there is no reasonable probability that the result would have been different. Much of the same information is contained within the record, particularly Jeff Green's inconsistent statements concerning the Wyckhuyse murder and defense counsel was aware of these inconsistencies. (*See*, *e.g.*, Tr. Vol. IX, p. 887–888.)

█ Likewise, the court has carefully examined Exhibit K which petitioner asserts contains exculpatory evidence concerning Vince Vehar's investigation of a million dollar "scam." Petitioner asserts that the information contained within Exhibit K could have been used to cross-examine Mike Hickey in that those involved in the "scam" could have caused Hickey "to finger an innocent man". Petitioner asserts that Exhibit K establishes motive for testifying at trial on the part of Jim Phillips, the former Uinta County Attorney who was allegedly involved in the "scam", as well as containing a threat by J.R. Goo that he would get even with Vince Vehar. Additionally, petitioner asserts that the report could have been used in cross-examining Dorothy Price, Vince Vehar's secretary, who testified concerning a phone call made by Mr. Vehar that "somebody's going to get killed out here", as the statement pertained to the ongoing investigation rather than to petitioner. The court has carefully reviewed this exhibit in light of petitioner's assertions, yet cannot conclude that this evidence might have affected the outcome of the trial or would have created a reasonable doubt that did not otherwise exist, assuming such information was not disclosed to the petitioner in another form. Petitioner's theories are highly speculative. Further, the testimony of Phillips, Goo and Price at trial was of relatively minimal significance as pertaining to petitioner's guilt. The court cannot stretch the significance of Exhibit K in light of the abundance of evidence existing at trial to confirm petitioner's guilt. Confidence in the outcome of the trial is not undermined. Nor can the court conclude this exhibit would create a reasonable probability that the result at trial would have been different. Likewise, the information contained in Appendix 44 can be so classified.

█ A related argument is raised in issue No. XVII of the petition that the prosecution's suppression of mitigating evidence created an unacceptable risk that the death penalty was imposed arbitrarily, capriciously, or as a result of whim or mistake. Much of this argument has been discussed above and the court cannot conclude that the evidence outlined there might have affected the outcome of the trial as it pertained to petitioner's sentence. Petitioner appears to raise a new argument here that the prosecution did not disclose that it did not have enough evidence linking the unknown killers to petitioner to get an indictment. This argument is purely speculative and unsupported by the record. Based on the foregoing, issues No. VII and XVII of the petition shall be dismissed.

Additionally, the court would note that petitioner has filed a motion for discovery pursuant to 28 U.S.C. § 2254, Rule 6, in conjunction with the petition in this case. The court can find no good cause exists which would warrant the granting of this motion and declines to authorize a "fishing expedition" in this matter. It follows that petitioners motion for discovery is hereby denied.

## Q. PUBLICITY AT SECOND SENTENCING

In issue No XIII of the petition, petitioner argues that he was denied his right to a fair and impartial jury at his second sentencing hearing because of adverse publicity generated by the prosecutor before and during the second hearing. Petitioner as-

serts that the adverse publicity created an unacceptable risk that the death penalty was arbitrary and capricious or resulted from whim or mistake. Petitioner also asserts that the prosecutor intentionally fabricated additional charges to be filed against him prior to the second penalty hearing to create adverse publicity and to revitalize the public's perception of the petitioner as a dangerous man. The court has reviewed the numerous exhibits and affidavits filed by the petitioner and is now prepared to rule on this issue.

The leading case concerning prejudicial trial atmosphere is *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). The defendant in that case was charged with murdering his wife and the case was made notorious during the pretrial period as the news media frequently aired charges against the defendant and aroused public sentiment for a conviction. This court will not delve into all the circumstances surrounding the *Sheppard* trial however, will note that it was described as a "carnival atmosphere." The Court in *Sheppard* looked at the totality of the circumstances in that case and found that identifiable prejudice need not be shown where probable prejudice exists, given the circumstances. The Court declined to state that the defendant was denied due process by the trial court's refusal to take precautions against the use of pretrial publicity alone, but considered the court's rulings against the setting in which the trial was held. The Court thereafter concluded that the defendant was deprived of that "judicial serenity and calm to which [he] was entitled." *Id.* at 355, 86 S.Ct. at 1518 (quoting *Estes v. Texas,* 381 U.S. 532, 536, 85 S.Ct. 1628, 1629, 14 L.Ed.2d 543 (1965). The Court based this conclusion on the obtrusive presence of the press at the courthouse and inside the bar, the lack of consideration for the privacy of the jurors, as well as the lack of control and supervision by the trial court over these outside factors. Further, the trial court did not question the jurors despite the extent and nature of the publicity to which they were exposed. As the trial judge did not fulfill

his duty to protect the defendant from the inherently prejudicial publicity within the community and to control disruptive influences in the courtroom, the Court granted the habeas petition and ordered the defendant released from custody.

■■■■■ The right to a jury trial guarantees the accused a fair trial by a panel of impartial jurors. *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The jurors however need not be totally ignorant of the facts and issues involved, it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Id.* The court must inquire as to whether the nature and strength of the opinion formed are such that in law necessarily raise the presumption of partiality. Where there is a possibility that prospective jurors have been exposed to pretrial publicity, the court must examine with care on voir dire to ensure that they are not biased. *United States v. Hall,* 536 F.2d 313 (10th Cir.1976), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976).

■■■■ In the instant case, it is clear that considerable publicity surrounding the petitioner existed during the period in which he was charged, convicted, sentenced and resentenced for his crimes. However, a careful review of the voir dire at the second sentencing hearing indicates that the jurors empaneled, although not totally ignorant of the case, were impartial. An examination of the voir dire demonstrates the jurors' lack of hostility to the petitioner and their minimal exposure to pretrial publicity. Court and counsel carefully examined the jurors to determine that they were not biased. Through the benefit of voir dire, the court is able to conclude that petitioner received a fair trial. There is no indication that his constitutional right to a fair trial by an impartial jury was impaired. *See Brinlee v. Crisp,* 608 F.2d 839 (10th Cir. 1979), *cert. denied,* 444 U.S. 1047, 100 S.Ct. 737, 62 L.Ed.2d 733 (1980). Issue No. XIII of the petition shall be dismissed.

### R. POST–TRIAL DISCOVERY

In issue No. XX of the petition, petitioner argues that he is entitled to post-trial discovery of exculpatory evidence and that such denial violated his due process rights. Petitioner asserts that until all possible fact-finding proceedings are terminated, the State must be bound by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and disclose any exculpatory evidence in any adversarial proceeding.

Petitioner has no concrete proof that any exculpatory evidence exists but surmises its existence because a grand jury continued to sit after his conviction to gather evidence relating to the unknown killers of Jeff Green. Because no indictments were returned against these unknown killers, petitioner asserts that exculpatory evidence must exist which shows that these unknown killers were in fact Green's murderers but that they were not hired by the petitioner. The court cannot agree. Petitioner's argument is highly speculative and there is no basis on which the court can conclude that any exculpatory material was withheld. Issue No. XX of the petition shall be dismissed.

### S. RIGHT OF CONFRONTATION—HEARSAY STATEMENTS

In issue No. VIII of the petition, petitioner argues that the court's introduction of out-of-court statements by Jeff Green and Vince Vehar violated his right of confrontation under the United States Constitution, as well as depriving him of his right to effective assistance of counsel and his right to defend. The court will discuss petitioner's arguments concerning effective assistance of counsel at a later point and will address the issue surrounding the confrontation clause herein.

At trial, out-of-court statements made by Jeff Green and Vince Vehar were introduced into evidence. The statements to which petitioner objects are as follows:

1. testimony by John Troughton concerning Vince Vehar's fear of the petitioner and his reasons for the filing of a complaint against petitioner which alleged threats and intimidation, (Tr. Vol. IV, p. 132–135, 164);

2. testimony by Dorothy Price concerning a statement made by Vince Vehar that "you cannot imagine what I've uncovered out in the Valley.", (Tr. Vol. VI, p. 668);

3. testimony by Ted Taylor, who owned a liquor store across the street from Vince Vehar's office, that Mr. Vehar expressed fear and threats by petitioner, (Tr. Vol. VI, p. 691–92);

4. testimony by Judy Jensen concerning a statement made by Jeff Green that if he told the truth it would mean his life, (Tr. Vol. X, p. 1003);

5. testimony by Bill Blair concerning statements made by Jeff Green regarding his reasons for rejecting the witness-protection program, (Tr. Vol. XI, p. 1194);

6. the court's allowing testimony by John Stevens that Jeff Green approached him about buying life insurance the day before his disappearance, (Tr. Vol. VIII, p. 1337);

7. testimony by Donley Linford concerning statements made by Jeff Green to the effect that if he testified to what he knew, he would be dead (Tr. Vol. IX, p. 892–918, 925); statements made by Jeff Green concerning his discussions with petitioner about the relative ways to kill Vince Vehar (Tr. Vol. IX, p. 927); statements by Jeff Green concerning why he decided to tell the truth (Tr. Vol. IX, p. 930–933); statements by Jeff Green as to why he refused witness protection (Tr. Vol. IX, p. 952); and

8. testimony by Tony Vehar that his father was nervous and expressed concern for his safety because he was dealing with the petitioner, Tr. Vol. IX, p. 844–846).

At trial, much of this testimony was admitted under Rule 803(3), Wyoming Rules of Evidence, as an exception to the hearsay

rule based on the declarant's then-existing mental condition. On appeal, the Wyoming Supreme Court found the victim's state of mind to be irrelevant in this case but upheld the admission of the statements under the catchall exception, Rule 804(b)(6). *See Hopkinson I*, 632 P.2d at 127–137. Petitioner argues that his confrontation rights were violated by the Wyoming Supreme Court's recharacterization of the applicable hearsay exception because petitioner did not have a chance to properly argue against this exception and further, the State was relieved of its burden to show that "particularized guarantees of trustworthiness" existed concerning the statements.

The Wyoming Supreme Court found that the five-part test for admissibility under the catchall exception was satisfied. These requirements are: the declarant's unavailability, pretrial notice to the adverse party or a sufficient opportunity to prepare for and contest the hearsay's admissibility, the truth of the matter asserted must be evidence of a material fact, the hearsay statement must be more probative than any other evidence which could be procured through reasonable efforts, and the statement must be supported by circumstantial guarantees of trustworthiness. *Id.* In considering the Confrontation Clause, the court further found that for admissibility of hearsay statements, the prosecution is required to establish the unavailability of the declarant and that there exists sufficient background information concerning the circumstances under which the hearsay statement was made to provide the jury with an adequate basis to evaluate its veracity. *Id.* Under this analysis, the Wyoming Supreme Court concluded that the statements were properly admitted with no resulting constitutional violation to the petitioner.

▇▇▇ The Sixth Amendment's Confrontation Clause states: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." This clause is made applicable to the states through the fourteenth amendment. *See Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Confrontation "insures that the witness will give his statements under oath, ... forces the witness to submit to cross-examination, ... [and] permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement." *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970). The constitutional right to confrontation does not mean that no hearsay evidence can ever be introduced. *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). The Confrontation Clause, however, was "intended to exclude some hearsay." *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). The test for establishing admissibility of hearsay is whether the declarant is unavailable and whether the statement bears some "indicia of reliability." *Id.* at 66–67, 100 S.Ct. at 2539–40. "[T]he clause countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'" *Id.* at 65, 100 S.Ct. at 2539 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934)). As stated in *Mancusi v. Stubbs*, 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972):

> The focus of the Court's concern has been to insure that there are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant; *Dutton v. Evans, supra* [400 U.S.], at 89 [91 S.Ct. at 220], and to 'afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement,' *California v. Green, supra* [399 U.S.] at 161 [90 S.Ct. at 1936].

Reliability can be inferred where the evidence falls within a firmly-rooted hearsay exception, otherwise the evidence must be excluded "absent a showing of particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539.

At the outset, the court would note that this case differs substantially from *Lee v. Illinois*, —— U.S. ——, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) which involved a co-conspirator's confession that, by its very nature, was presumptively unreliable. The court herein cannot agree with petitioner that the admission into evidence of the hearsay statements outlined above violated the Confrontation Clause of the Sixth Amendment. The testimony by John Troughton related to a complaint filed by Vince Vehar against petitioner wherein allegations were made by Mr. Vehar concerning petitioner's threats and use of intimidation. As such, there was sufficient indicia of reliability surrounding this testimony. The admission of the specified testimony by Dorothy Price is questionable as Mr. Vehar may have been referring to something independent of petitioner; however, due to the statement's inherent vagueness and in light of all the other corroborating evidence pertaining to Mr. Vehar's fear of petitioner, any error caused by its admission would be harmless. It would have little, if any, effect on his convictions. The testimony of Ted Taylor is couched with an indicia of reliability in that Mr. Taylor testified not only to Mr. Vehar's fear, but also to his actions in stopping by Mr. Taylor's liquor store after his office closed while Mr. Taylor would watch for him to ensure his safe arrival. Similarly, the testimony by Tony Vehar matched his own impressions of his father during the relevant time period.

The testimony by Judy Jensen concerning a statement made by Jeff Green likewise bore sufficient indicia of reliability based on evidence pertaining to Green's behavior at the time. The same can be said for the statements attributed to Bill Blair and Donley Linford. Further, the record as it pertains to Donley Linford's testimony also involved statements made by Jeff Green at Jamey Hysell's trial. Those statements made by Green corroborated portions of Linford's testimony. Further, John Stevens' testimony pertained to Jeff Green's actions in trying to obtain life insurance prior to his death. All of this evidence bore sufficient "indicia of reliability" and "particularized guarantees of trustworthiness" and its admission did not violate the Confrontation Clause.

The court cannot agree with petitioner's argument that the burden was shifted from the State to the defense because of the Wyoming Supreme Court's decision to alter the exception under which the hearsay was found admissible. The Wyoming Supreme Court made its determination that the State satisfied its burden from the facts contained within the record. Accordingly, issue No. VIII shall be dismissed.

## T. EFFECTIVE ASSISTANCE OF COUNSEL

In issue No XIX, petitioner argues that he was denied the effective assistance of counsel in his guilt/innocence trial and at the second penalty hearing. Petitioner asserts that the prosecutor's "manipulation" of witnesses insured the denial of his right to effective assistance of counsel, as these tactics prevented his attorneys from being effective. Petitioner also complains that the trial court improperly prevented his attorneys from cross-examining Mike Hickey about his passage of a lie detector test; that the prosecutor's nondisclosure of evidence undermining the reliability of the Vehar/Green hearsay deprived counsel's effectiveness; that counsel had inadequate preparation time for trial; that trial atmosphere, the presentation of Suesata to the jury, and the denial of discovery also precluded counsel's effectiveness; that the trial court's refusal to allow defense to argue petitioner's conviction was unreliable as a mitigating factor hampered effectiveness, as did the prosecution's use of misleading evidence.

Petitioner additionally asserts that his counsel's performance was objectively unreasonable as his attorneys failed in their duty to investigate, did not make timely objections and did inadequate briefing. Petitioner further asserts that he was prejudiced by counsel's inadequate performance.

Petitioner seeks a new trial or an evidentiary hearing on this issue.

[96–103] The sixth amendment right to counsel is needed to protect a defendant's right to a fair trial. *See Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). The right to counsel is the right to the effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). The purpose of the effective assistance guarantee is not to improve the quality of legal representation, but to ensure criminal defendants a fair trial. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The court, in deciding an ineffective assistance of counsel claim, must judge the reasonableness of counsel's challenged conduct under the then-existing facts of each case and in so doing, should keep in mind that counsel's function is to make the adversarial testing process work in the particular case. *Id.* at 690, 104 S.Ct. at 2066. The defendant must establish that he was prejudiced by any error attributed to counsel. It must be shown that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *Id.* A verdict that is only weakly supported is more likely to have been affected by error than one with overwhelming record support. *Id.* at 696, 104 S.Ct. at 2069.

▮▮▮▮▮ In the instant case, the court would note that much of what petitioner objects to herein has already been ruled upon by this court as proper. In light of the court's determination concerning Mike Hickey's cross-examination, nondisclosure of exculpatory material, manipulation of witnesses, trial atmosphere, Suesata's testimony, denial of discovery, reliability of the conviction as mitigating evidence and the use of misleading evidence, petitioner's arguments that these instances denied him effective assistance of counsel are meritless. As to petitioner's argument that his counsel had inadequate preparation time for trial, the court would note that the indictments were returned in June of 1979 and the trial began on September 3, 1979. There was clearly more than adequate time for trial preparation.

▮▮▮▮▮ As to petitioner's claims concerning the unreasonableness of his counsel's performance, the court notes that counsel does not specifically refer to any portions of the record in which his counsel allegedly erred. The court is sufficiently familiar with the record to conclude that even if counsel erred by failing to object in certain situations, petitioner, under the *Strickland* standard, was in no way prejudiced. Likewise, petitioner asserts his counsel failed in their duty to investigate because they did not discover the information contained in Exhibit K. Counsel has a duty to make a reasonable investigation or to make a reasonable decision not to investigate. *Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. at 2066–67. There is nothing in the record to indicate that counsel's actions were unreasonable in any regard. Petitioner has failed to establish the existence of an ineffective assistance of counsel claim, as well as the need for an evidenciary hearing on this matter. It follows that issue No. XIX shall be dismissed.

Based on the foregoing discussion, the petition for writ of habeas corpus shall be dismissed. The court will entertain any motion for reconsideration of this Memorandum and Order which shall be filed within the applicable time period prescribed by law.